**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-00518-NYW

DANIEL PERTILE, an individual; and GINGER PERTILE, an individual,

    Plaintiffs.

v.

GENERAL MOTORS, LLC, a Delaware limited liability company;
TRW VEHICLE SAFETY SYSTEMS INC., a Delaware corporation;
KELSEY-HAYES COMPANY, a Delaware corporation;
JOHN DOE NOS. 1-25; and
JOHN DOE COMPANIES NOS. 1-25,

    Defendants.

**PLAINTIFFS' MOTION FOR SANCTIONS AGAINST GENERAL MOTORS, LLC**

The Court invited Plaintiffs to move for sanctions if they claim GM made misrepresentations to the court. (*See* Ex. A, October 7, 2016 Hearing Transcript, pp. 12-13; Order, Doc. 166). For over eighteen months GM has engaged in a deceptive campaign to deny the Court and Plaintiffs access to the truth by misrepresenting the facts surrounding its Finite Element Modeling (FEMs). In the same way an injured plaintiff is gravely harmed when a manufacturer conceals a product defect, the judicial system's search for truth (and the public itself) are harmed by purposeful concealment of facts. As the Fourth Circuit Court of Appeals recognized:

> **Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice.** However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions - all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. **Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process.**

*U.S. v. Shaffer Equip. Co.,* 11 F.3d 450, 457 (4th Cir. 1993) (emphasis added).

1

Plaintiffs have long known GM's Finite Element Modeling contains important roof defect evidence. Knowing the FEMs will confirm Plaintiffs' contentions, GM has engaged in abusive litigation, misrepresented essential facts and data, disrupted the judicial system's truth-seeking functions, and misled the Plaintiffs, the public, and this court into believing its modeling was either early pre-production designs only, or useless. Plaintiffs' first motion to compel was denied in large-part due to the court's then reasonable reliance on these misleading claims. However, GM's position regarding the existence and relevance of FEM models has "evolved" over time, and its corporate representatives' and expert's depositions reveal its prior representations were false. GM does, in fact, have **final** models of the 2011 Chevrolet Silverado and such models could be readily utilized.

## THE MISREPRESENTATIONS

**Misrepresentation #1:** GM's briefing, oral argument, and sworn affidavits repeatedly represent that GM never used FEMs for the final production design of the subject vehicle. For instance, the September 22, 2015 Lu Affidavit stated "GM's computer modeling technology **requested in this case does not contain the final production design used on the subject vehicle**" and "GM's modeling technology contains a snapshot of the pre-production design." (Doc. 96-1, Lu Affidavit at ¶28).[1] Likewise, in the October 30, 2015 hearing, GM's counsel represented the models were from the "first half" of the design process and not even close to the final design. (Ex. B, Hearing Transcript, p. 29). GM's September 22, 2015 briefing also stated the models do not contain the production design of the vehicle, that they were used "*early* in the design process to test

---

[1] *See also* Doc 96-1, Lu Affidavit at ¶8 (computer modeling allows assessment of "pre-production designs" prior to building a physical prototype); and ¶28 (FEMs are not identical to the final design; GM's FEMs are only a "snapshot of the pre-production design" and; Plaintiffs' proposed use of GM's FEMS would be invalid because they are "pre-production designs").

2

preliminary designs, not the final production design", and that the date closest in time and effort to the final product will *not* be in the FEMs. (Doc. 96, GM's Response to Motion to Compel at p. 4, p. 12, and p.8, fn. 7 citing Lu Declaration at ¶5).

However, in a complete about-face, in their June 2016 depositions, **GM engineers testified that GM used FEMs for <u>final sign-off</u>** [2] **of the Plaintiffs' vehicle** and other GMT 900 vehicles.[3]

> Q: Why did you build that model for the 2007 and '08?
> A: We needed to validate the design to meet the roof crush strength requirement.
> Q: And that was the design of the physical vehicle being sold to the public?
> A: Yeah.

(Ex. C, June 16, 2016 Chao Depo, page 51). Chao deposition Exhibit 1 (attached Ex. D) further shows GM's reliance on FEMs and CAE to sign off the roof structure at issue. After reviewing this document, Chao <u>confirmed</u> Plaintiffs' GMT 900 Crew Cab truck was signed-off using CAE:

> Q: Okay. So this analysis described in Exhibit 1 was used to sign the crew cab off for the program goals, roof strength?
> A: Yeah.

(Ex. C, Chao Depo., p. 33). In addition, the June 17, 2016 Lu corporate representative deposition also confirms final vehicle sign-off by computer model.[4]

---

[2] "Final sign-off" is the final testing done to ensure the <u>production level vehicle</u> may be sold to the public.

[3] Chao was the Engineering Group Manager at the time the subject vehicle was designed and tested. Given his role in charge of overseeing the use of FEMs to conduct CAE modeling for roof structure, Chao was aware GM used CAE/FEM to "validate" the subject vehicle (i.e. "sign-off" or approve it for sale), and confirmed "[v]alidation is validating the <u>design going into production</u> meets the performance requirement." (Ex. C., Chao depo., p. 24).

[4] Lu testified:
> Q: So the validation and effort to make sure it met the program goal for the 2007 Suburban was done in a computer with a computer model?
> A: Was done using the CAE tool, math-based CAE tool.
> Q: Which is a computer?
> A: Was a computer simulation, yes.

(Ex. D, July 17, 2016 Lu 30(b)(6) depo., p. 53).

Plaintiffs also learned for the first time in deposition that while GM subjected all GMT 800 series vehicles to physical roof structure tests, it did <u>not</u> do so for the later GMT 900 series at issue here. Instead, GM only ran a **single** physical test on a one "lead" vehicle for correlation. Most versions of the GMT 900 vehicles, including the crew cab pickup, were signed off for roof strength using only finite element simulations. Chao described this as "validat[ing] the derivatives." (Ex. C, Chao depo., pp. 10-11 and 14).

What this all means is **GM performed FEM analysis <u>on final production vehicles</u> in the GMT 900 series – directly contradicting the information it provided this court that its FEMs were only used in "pre-production" designs.**

GM's misrepresentations that the finite element (a/k/a CAE) models were not used at final signoff is significant because the Court materially relied on this claim in concluding "FEA Models do not necessarily reflect the Chevrolet Silverado 2500 HD crew cab… as manufactured that was subject to the roll-over accident at issue." (Order, Doc. 121 at p.5, citing GM's Brief Doc. 96 at p.8 and Lu affidavit, Doc. 96-1 at ¶7). The court further relied on GM's misrepresentations when it stated "FEM Models allow GM engineers [to] assess pre-production designs of the vehicle systems, components or parts." (Order, Doc. 121 at p.5, citing Lu affidavit, Doc. 96-1 at ¶8). Moreover, at the heart of the court's analysis of FEM relevancy lies the notion the files "vary in isolation or combination from the **final product design**" and therefore anything produced would not be "relevant." (Order, Doc. 121 at p.5; citing Doc. 107-1 at ¶15). Had GM told the truth – that GM used production level FEMs to sign-off the subject vehicle's roof structure – the Court would not have been able to conclude the models were irrelevant to Plaintiffs' need.

**Misrepresentation #2**: GM told the court it did not update the FEM to the final design level, noting "design changes typically are not made to the computer simulation models" once GM begins to conduct "physical tests or other testing and analysis." (Doc. 96-1, Lu Affidavit at ¶ 28, also stating "GM's computer modeling technology requested in this case does not contain the final production design used on the subject vehicle"). The Court relied on these representations, concluding GM's FEMs do "not reflect actual real-world testing performed on the final design of the vehicle at issue." (Order, Doc. 121, p. 3). The Court also noted "the input data reflects a body of information that GM engineers chose from to run computer simulations <u>that do not reflect the final design of the vehicle at issue</u>, or perhaps, even an interim design." (Order, Doc. 121, p. 9)(emphasis added).

Contrary to GM's representations to this court, it is now known that GM signed-off and approved the subject vehicle for sale **using computer simulations**. In order to do so, **GM did in fact update its FEM to final design level** in order to sign-off the subject GMT 900 Crew Cab truck.

> Q: Why did you build that model for the 2007 and '08?
> A: We needed to validate the design to meet the roof crush strength requirement.
> Q: And that was the design of the physical vehicle being sold to the public?
> A: Yeah.

(Ex. C, Chao Depo, p. 51).

**Misrepresentation #3**: GM told this Court it was unable to locate finite element models that reflected the final production design of the subject vehicle. Lu's September 2015 Affidavit unambiguously declared, "I conducted a search for the specific types of models requested by plaintiffs in this case. I was unable to locate finite element computer modeling technology that is representative of the final production design of the subject

5

vehicle." (Doc. 96-1, Lu Affidavit at ¶ 29).  However, Lu's June 2016 corporate testimony dispels the notion GM does not possess FEM data reflective of final production design for the GMT 900 Crew Cab roof structure:

> Q: So there are models for the crew cab, computer models?
> A: There are models for the roof strength simulation -- crew cab roof strength simulation.
> Q: Okay. And those exist today?
> A: They do.
> Q: Okay. Where are they located?
> A: I don't know where they are physically located, but that's what -- when I inquire about the model search, GMT900 crew cab roof strength simulation, that they have found. They have informed me that they have searched and then found these models.

(Ex. E, Lu F.R.C.P. 30(b)(6) deposition, p. 64).  Lu went further in her deposition, confirming that three FEM crew cab models currently exist and that GM used them in an attempt to evaluate the Notice of Proposed Rulemaking (NPRM) regarding a change to the FMVSS 216 government roof crush test:

> Q: And the crew cab models that are still in existence, those are for roof strength?
> A: Yes, for the NPRM and -- or roof strength study, which is different than our subject vehicle roof structure.
> Q. How many -- how many -- how many crew cab models are there?
> A. I was told three.

(Ex. E, Lu F.R.C.P. 30(b)(6) deposition, p. 65).

> Q: They involved changes that improved the strength of the roof?
> A: Well, various design proposals at the time to make the changes in response to the -- in response to the --
> Q: To the notice?
> A: -- FMVSS 216 NPRM.
> Q: Okay. But those models included possible changes to the roof to make it stronger in the crew cab?
> A: Well, I don't know for sure. I did not look at the model myself. That's what I was told. They believe that those models were used, not for the design and development of the crew cab or production release. That was being used for the NPRM study.

(Ex. E, Lu F.R.C.P. 30(b)(6) deposition, p. 67).

6

This testimony confirms several production level models do exist.  In addition, two of these are production level models with the addition of alterative designs intended to strength the vehicle's roof.  Part of the Colorado risk-benefit test for proving defect includes the existence and feasibility of alternative designs.  *See e.g., White v. Caterpillar, Inc.*, 867 P.2d 100, 105 (Colo.App. 1993) (explaining under Colorado law that the "efficacy of alternative designs" can be used to determine whether a product is "unreasonably dangerous").  As such, these models which demonstrate alternative designs are not only relevant, they are central to this case.  GM knows this.

Lu's thinly-veiled attempt to distinguish these models as "different than our subject vehicle roof structure" lacks candor and is easily dispatched.  The truth is, GM's NPRM model reflects the GMT 900 Crew Cab production-run FEM data <u>plus</u> the addition of minor revisions necessary to evaluate proposed roof crush standard changes.  Thus, these models are **identical** to the actual model used to sign-off the subject vehicle, with only a few small alterative design additions.  As GM knows, these models can very simply be reverted back to the sign-off production release version of the model GM utilized for the subject vehicle. (*See* Ex. G, Dr. Vlahinos Affidavit).  Shockingly, GM <u>never</u> told the court these near final design models existed, instead providing only the half-truth that "final production" FEMs do not exist.[5]  In fact, GM took **no steps** at all to disclose that it had these models.  Indeed, their existence was uncovered **only** when Plaintiffs discovered an FEA report among the hundreds of thousands of documents dumped on them in this case, and confronted GM employees Chao and Lu with that report during their depositions.  It

---

[5] Relying on GM's representations, the Court concluded "[b]ut the FEA Models themselves do not necessarily tell Plaintiffs what GM actually knew about the design of the roof structure." (Order, Doc. 121, p. 9).  GM testimony confirms this is untrue.

7

was only then that GM admitted – for the first time – to possessing three separate final and/or near-final FEA models.

**Misrepresentation #4:** One of the primary bases for GM's refusal to provide FEMs was its insistence that available GM modeling would be useless because it would take too much time to modify. It argued FEM data was not "final" and as a result, any FEM data would be inferior in quality, and it would cost more to produce a working model than using the 3D CAD. (*See*, Doc. 96-1, Lu Affidavit, ¶ 30, stating "[w]ith GM's electronic 3D CAD files, it would take less time, less resources and be more accurate to create a new finite element model starting from scratch, than it would be to take an existing finite element model from years ago…"). Lu went on to contest Plaintiffs' position that "updating an old finite element model 'can be easily made – often with a single key stroke'" by telling the court Plaintiffs' argument was "not true." (Doc., 96-1, Lu Affidavit ¶30, summarizing GM's position by stating "[t]herefore it should take less time and be less expensive to create a new model using the same 3D CAD data already produced by GM"). The court directly relied on these misstatements when it concluded "it would be slower and more expensive to build a finite element model than to use one already designed by GM." (Order, Doc. 121, citing Doc. 107, p. 4 and Doc.107-1 at ¶16).

Facts learned at the Lu and Chao depositions dispel these representations and prove GM has models that can be easily converted to actual production models. (Ex. B, Dr. Vlahinos Affidavit). End-stage, post-production models exist – specifically crew cab roof FEMs used by GM for purposes of analyzing compliance with a newly proposed government roof crush standard. (Ex. E, Lu F.R.C.P. 30(b)(6) depo., p. 65). Moreover, Chao confirmed the commonsense fact that a viable can be reused:

8

> Q: If you have the FEMs for the GMT900, neither you nor Vlahinos would have to build a model from scratch, would you?
> A: If the model is there, yeah, we can reuse it.

(Ex. C, Chao Depo., p. 88).

> Q: But if you had the roof crush model with the FMVSS 216 Load case, at least neither of you would have to build that model from scratch; is that true?
> A: This is correct.

(Ex. C, Chao Depo., pp. 88-89).

Based on this testimony and the now-known existence of the FEMs, it is evident GM purposely misled the Court when it said its available FEM data was inferior and ultimately more costly, which led the Court to rule in GM's favor on Plaintiffs' previous motion to compel.

## **SANCTIONS ARE WARRANTED**

Sanctions are appropriate because GM has materially misled this court and refused to produce relevant and necessary FEM data for well over a year. This has not only harmed Plaintiffs, it has harmed the entire litigation process and this court.

F.R.C.P. 37(c) allows the Court to issue sanctions if a party "fails to provide information" as required by the F.R.C.P. 26(a) initial and expert disclosure rules, or fails to supplement discovery responses or disclosures in compliance with F.R.C.P. 26(e) if the party learns its prior response was incomplete or incorrect. In such cases, the court can exclude use of such information at trial, order payment of expenses including attorney's fees, inform the jury of failure to produce, or issue other sanctions. F.R.C.P. 37(c). *See also*, *Kaufman v. Am. Fam. Mut. Ins. Co.*, CIV.A. 05-CV-02311WD, 2008 WL 1806195, at *7 (D. Colo. Apr. 21, 2008) (courts have "inherent authority and authority

9

under Fed.R.Civ.P. 37(b)(2) to impose sanctions for discovery violations")[6]; *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997) (recognizing "magistrate judges have the authority to order discovery sanctions" for discovery abuse).[7]  In addition, 28 U.S.C. § 1927 authorizes sanctions.[8]  *Hamilton v. Boise Cascade Exp.,* 519 F.3d 1197, 1203 (10th Cir. 2008) (noting that sanctions imposed against an attorney under 28 U.S.C. § 1927 "are levied to compensate the victims of dilatory practices, not as a means of punishment.").

Here, GM's practices are more than just "dilatory."  GM engaged in what can only be called deliberate misrepresentations by suggesting production level FEM models did not exist and the only models in existence were irrelevant pre-production models that would be too costly or difficult to update.  The facts now reveal this to be untrue.  Sanctions for this conduct – which undermine the entire court process – are necessary to remedy harms done to Plaintiffs and to prevent GM from engaging in future similar misconduct.

## **CONCLUSION**

GM's misrepresentations have misled this Court and thwarted its truth-finding function.  GM validated the GMT 900 Chevrolet Silverado truck for final pre-sale sign-off

---

[6] *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (federal courts have inherent authority to assess attorney's fees "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"); *Philips Elecs. N.A. Corp. v. BC Tech.,* 773 F. Supp. 2d 1149, 1196 (D. Utah 2011) ("The court has the obligation to ensure that the judicial process is not abused; thus, '[t]he policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth'"); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 181 (S.D.N.Y. 2003), *adhered to on reconsideration,* 00 CIV. 3613 (LAP), 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004) ("A lawsuit is supposed to be a search for the truth and the tools employed in that search are the rules of discovery. Our adversary system relies in large part on the good faith and diligence of counsel and the parties in abiding by these rules and conducting themselves and their judicial business honestly").

[7] *See also, Palgut v. City of Colorado Springs,* CIVA 06-CV-01142 WDM, 2008 WL 2690701, at *2 (D. Colo. July 3, 2008) (same).

[8] 28 U.S.C.A. § 1927 states, in relevant part, "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

using FEMs.  GM currently possesses final production-level FEM data.  These facts cannot be reconciled with GM's prior positions.  It is now abundantly clear this court has been misled by GM from the inception of this case.  GM's conduct cannot be tolerated any longer.  Sanctions are the only means available to remedy the past injustices in this case and prevent future harm to the Plaintiffs and the court.  As such, Plaintiffs respectfully request that the Court enter sanctions against GM for its inappropriate litigation conduct, and to prevent further injustices, in an amount and kind the court deems appropriate.

**D.C.COLO.LCivR 7.1** - The parties met and conferred on this motion.  No agreement could be reached and General Motors (GM) opposes the relief sought.

RESPECTFULLY SUBMITTED this 6th day of December, 2016.

/s/James L. Gilbert
James L. Gilbert
Anne M. Dieruf
Anthony P. Bolson
THE GILBERT LAW GROUP, P.C.
5400 Ward Road, Building IV, Suite 200
Arvada, CO 80002
(p) 303-431-1111 (f)303-431-1633
jgilbert@thegilbertlawgroup.com
adieruf@thegilbertlawgroup.com
abolson@thegilbertlawgroup.com

and

Darin L. Schanker
BACHUS & SCHANKER, L.L.C.
1899 Wynkoop Street, Suite 700
Denver, Colorado 80202
(p) 303-893-9800 (f) 303-893-9900
dschanker@coloradolaw.net

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December 2016, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF System, which will send notification of such filing to the following e-mail addresses:

| VIA COURT CM/ECF E-FILING SYSTEM ||
|---|---|
| Kent B. Hanson<br>Mickey W. Greene<br>Hanson Bolkcom Law Group, Ltd.<br>527 Marquette Avenue, Suite 2300<br>Minneapolis, MN 55402<br>khanson@hblawgroup.com<br>mbolkcom@hblawgroup.com<br>mgreene@hblawgroup.com<br><br>**Attorneys Defendant General Motors, LLC** | Matthew E. Coveler<br>Jason P Hartman<br>WEINSTEIN TIPPETTS & LITTLE LLP<br>7500 San Felipe, Suite 500<br>Houston, Texas 77063<br>Telephone: (713) 244-0800<br>Facsimile: (713) 244-0801<br>matthew.coveler@wtllaw.com<br>jason.hartman@wtllaw.com<br><br>Jordan Lipp, Esq.<br>DAVIS GRAHAM & STUBBS LLP<br>1550 17th Street, Suite 500<br>Denver, CO 80202<br>Telephone: (303) 892.7471<br>Facsimile: (303) 893-1379<br>jordan.lipp@dgslaw.com<br><br>**Attorneys for Defendants TRW VSSI and & Kelsey-Hayes Company** |

                                            *s/Lindsey Berg*
                                            Lindsey Berg,
                                            lberg@thegilbertlawgroup.com