```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3     Case No. 15-cv-00518-WJM-NYW

 4     -----------------------------------------------------------
       DANIEL PERTILE AND GINGER PERTILE,
 5
          Plaintiffs,
 6
       vs.
 7
       GENERAL MOTORS, LLC, TRW VEHICLE SAFETY
 8     SYSTEMS, INC., KELSEY-HAYES COMPANY,

 9        Defendants.
       -----------------------------------------------------------
10          Proceedings before NINA Y. WANG, United States

11     Magistrate Judge, United States District Court for the

12     District of Colorado, commencing at 1:32 p.m.,

13     October 30, 2015, in the United States Courthouse,

14     Denver, Colorado.

15     -----------------------------------------------------------

16          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17     ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18     -----------------------------------------------------------
                            APPEARANCES
19
            JAMES LOUIS GILBERT, ANNE MARIE DIERUF, and DARIN
20     LEE SCHANKER, Attorneys at Law, appearing for the
       Plaintiffs.
21
            DANIEL ROBERT MORDARSKI, Attorney at Law, appearing
22     for General Motors.

23          KYLE WESLEY BRENTON, Attorney at Law, appearing for
       TRW Vehicle Safety Systems.
24     -----------------------------------------------------------
                          MOTION HEARING
25
```

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 2

```
 1              P R O C E E D I N G S
 2        (Whereupon, the within electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5            THE COURTROOM DEPUTY:  All rise.  Court is now in
 6   session.
 7            THE COURT:  Thank you.  Please be seated.  We are
 8   here today in 15-cv-518-WJM-NYW, Pertile, et al. versus
 9   General Motors, LLC, et al.  Could I have appearances of
10   counsel, please.
11            MR. GILBERT:  I'm Jim Gilbert for the plaintiffs,
12   Your Honor.  And I'm with my partner, Ann Dieruf; and
13   Lindsey Berg.
14            THE COURT:  Good afternoon.
15            MR. MORDARSKI:  Your Honor, Dan Mordarski on
16   behalf of General Motors.  I have with me my client
17   representative Ms. Huizhen Lu.
18            MR. BRENTON:  Kyle Brenton, Davis Graham & Stubbs
19   on behalf of TRW and Ms. Hayes.
20            THE COURT:  Good afternoon.  All right.  I
21   believe we are here for a motions hearing on the motion
22   to compel the finite element models.  It is your motion,
23   Mr. Gilbert.  Would you like to proceed?
24            MR. GILBERT:  I would be happy to do that.
25            THE COURT:  All right.
```

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 3

1        MR. GILBERT:  Your Honor, we're here today

2   because General Motors is seeking what many courts around

3   the country, both federal and state, have called a

4   rarity.  Namely, this defendant wants to impose an

5   absolute prohibition on providing or disclosing any of

6   what it calls its finite element modeling.  It claims

7   that the modeling -- computer modeling is a trade secret

8   deserving of that protection because of the risk of grave

9   harm to the company if it's disclosed and the absence of

10  any need by the plaintiffs for this information.

11       And I want to go through each one of the elements

12  of what needs to be shown here both by General Motors and

13  by the plaintiffs.  First of all, the parties agree that

14  Centurion is the case that controls a resolution of this

15  dispute, and I'm sure the Court has seen briefing by both

16  parties on the Centurion case.  We had a little problem,

17  though, with General Motors, the way they have posed the

18  sequencing of the burdens.

19       First of all, GM claims that they have to show

20  that it's a trade secret.  And, of course, we have

21  stipulated that it is a trade secret.  Then GM claims

22  that the burden shifts to the plaintiff to show the need

23  for disclosure of the information, and only after

24  plaintiff has shown the need for disclosure does the

25  burden then shift to General Motors to show that that

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 4

1   need is outweighed by the risk of harmful disclosure.

2   That's not what Centurion said.  Centurion says that

3   trade secrets as shown -- we've agreed.  Then the burden

4   remains on General Motors to prove harmful disclosure

5   risk, and only then does the burden shift to the

6   plaintiffs to show need.

7           So going through the correct sequencing required

8   by Centurion, I would like to first address the

9   disclosure risk.  There's two aspects of a disclosure

10  risk.  First of all, is there a risk at all of any

11  disclosure?  And then if there is, is that disclosure

12  going to be harmful?  And how much harm will it cause

13  General Motors?  Because, of course, all the cases say

14  that what needs to be done is a balancing of the harm

15  against the need.  It doesn't say that one has to wipe

16  out the other.  It says that the court is required to do

17  a balancing.

18          Now, in our case, as we'll see in a few minutes,

19  we believe the evidence of the need is overwhelming.

20  It's not cumulative.  It's overwhelming, and I'll go

21  through each of the factual bases for the need.  Let's

22  stop for a minute, though, and talk about the risk of any

23  disclosure.  First of all, this material, if the Court

24  orders it disclosed as we're asking the Court to do, it's

25  going to be given to one expert, one expert.  We aren't

Page 5

1    going to give it to all of our experts.  We aren't going

2    to share it with anyone.  We are bound by the strict form

3    of protective order the Court has already entered.  One

4    expert.

5             THE COURT:  Has that expert -- the identity of

6    that expert been identified to GM?

7             MR. GILBERT:  We provided his affidavit in

8    support of our showing of need, Dr. Andreas Vlahinos.

9    And I think the Court is aware having read the briefs of

10   Dr. Vlahinos' affidavit.

11            THE COURT:  Okay.

12            MR. GILBERT:  We filed an affidavit.  Going to

13   the strict form of protective order, we aren't

14   competitors of General Motors.  We don't make cars.  We

15   have no interest whatsoever in disclosing any of this

16   material to a competitor of General Motors.

17            Secondly, Dr. Vlahinos, Andreas Vlahinos, we have

18   gone through his affidavit.  And we have shown in our

19   briefing and his affidavit how he is bound by the

20   strictest form of secrecy in the work he does for our

21   military.  He designs vehicles currently in use or

22   participates in the design of vehicles currently in use

23   in both Afghanistan and Iraq.

24            He knows what secrecy agreements are.  And he

25   knows that the form of protective order, if he gets

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 6

1  access to the FEMs and does work on them as our only

2  expert who will be allowed to do that, he knows he's got

3  to return those at the end of the case.  And he doesn't

4  keep this stuff.  There's no reason for him to keep it.

5  He is not a competitor of General Motors.  He has no

6  reason whatsoever to disclose this information to anyone.

7          I've been doing this -- these kinds of cases for

8  more than three decades, Your Honor.  I've had dozens of

9  cases with General Motors.  I've never once had it even

10  intimated that I have violated a protective order.  I

11  take seriously my obligation under the law and under

12  court orders, as does Dr. Vlahinos.  I think the Court

13  will understand -- I hope the Court will understand if I

14  have persuaded properly that the fear of disclosure here

15  is not fear of disclosure to competitors.  It's a fear of

16  disclosure to someone who has been injured by one of

17  General Motors' products.

18          Ms. Lu, who is seated with counsel at counsel

19  table, has previously testified that these engineers in

20  the industry who do the finite element modeling, they,

21  quote, "come and go."  There are hundreds of these people

22  who at some point work on finite element modeling, some

23  for General Motors, some for Nissan, some for Honda, some

24  for Ford, Chrysler.  They don't stay at one job for their

25  work career.  They may quit Ford and go to General Motors

Daniel Pertile, et al. vs.                                      Motion Hearing
General Motors, LLC, et al.                                    October 30, 2015

Page 7

 1    and then go on to Toyota.  But they come and go as she

 2    has described it.  And if there was a risk of disclosure,

 3    you'd think that that risk would be greatest where you

 4    have a bunch of engineers going from one company to

 5    another to another.

 6            Next, General Motors, in the industry they

 7    participate in national and international meetings

 8    discussing this stuff.  They share shoptalk.  They talk

 9    shoptalk.  They share information, their latest modeling

10    technology.  And while GM spends a lot of time boasting

11    about its superiority in modeling technology, of course,

12    all the companies think that what they do is better than

13    anyone else.  But ultimately it doesn't matter.

14            It doesn't matter if GM's technology, if their

15    modeling -- the modeling of this truck and other vehicles

16    is better than Ford's.  It doesn't matter.  We don't want

17    it because it's superior necessarily.  We don't want it

18    because it's inferior.  We want it because it's General

19    Motors.  It's only General Motors modeling that tells us

20    what General Motors knew at the time they were making

21    important decisions about the design and testing of our

22    vehicle.

23            Do you have General Motors' brief?  I didn't

24    bring my reading glasses.  And I'm sorry.

25            We mentioned outsourcing, Your Honor, in a brief

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 8

 1    we filed.  It was Document 87.  We filed it on

 2    September 1.  At the last page of that brief on page 12

 3    we referred to General Motors outsourcing a significant

 4    amount of finite element work.  Now, in the auto industry

 5    outsourcing typically occurs when a manufacturer like

 6    Ford, Chrysler, or General Motors knows that they don't

 7    have the particular specialty expertise to do a portion

 8    of what's needed for their vehicle.

 9           For example, Ford and General Motors outsource

10    their seats.  Companies like Johnson Controls makes the

11    seat.  General Motors doesn't make seats.  They don't

12    know how to make seats.  They don't want to have to

13    devote their resources to making seats.  Same with seat

14    belts.  GM, Toyota, Honda, they don't make seat belts.

15    They rely on companies like TRW, who Mr. Brenton

16    represents, to make seat belts and electronic stability

17    control.

18           So we have suggested that General Motors

19    outsources this finite element modeling, thereby

20    voluntarily exposing itself to a risk of disclosure to

21    competitors.  Now, General Motors -- Ms. Lu filed an

22    affidavit responding to that claim.  And at page 6 --

23    Paragraph 16 of her affidavit, which is Document 96-1,

24    Ms. Lu on behalf of the General Motors legal department

25    says, "GM does not disclose or share any trade secrets

Daniel Pertile, et al. vs.                                          Motion Hearing
General Motors, LLC, et al.                                      October 30, 2015

Page 9

 1   with outsourcing companies.  For instance, GM has hired
 2   other companies to assist with the initial creation of
 3   finite element models.  This work only involves the very
 4   preliminary stage of creating a model.  In those
 5   situations GM provides the outsourcing companies with the
 6   CAD data.  The outsourcing companies assemble the
 7   geometric files and create a basic mesh.  That is where
 8   the outsourcers stop.  This early stage model is then
 9   sent to GM engineers at the Warren Technical Center.  GM
10   engineers then complete the finite element model by
11   creating critical information, et cetera."
12         In other words, the outsourcing company does some
13   of the preliminary meshing they call it.  And
14   Mr. Mordarski was very helpful in explaining to the
15   plaintiffs and to counsel in the August hearing what this
16   meshing is, very preliminary meshing.  GM then, following
17   up on Ms. Lu's affidavit, says that the plaintiffs'
18   motion speculates.  And this was in Document 96.
19   Speculates on page 17 that GM's secrets are shared when
20   it participates in conferences, et cetera.  Plaintiff
21   also claims that GM shares its secret when it outsources
22   computer modeling creation.
23         Then on page 18 -- I want to read this language
24   because it's very important -- "Likewise, GM does not
25   disclose or share any trade secrets with outsourcing

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 10

1    companies.  GM has hired other companies to assist with

2    the creation of finite element models, but this work only

3    involves the very preliminary stages of creating a model.

4    In those situations GM provides the outsourcing companies

5    with the CAD," similar to what Ms. Lu said in her

6    affidavit.

7            "The companies assemble the geometric files,

8    create a basic mesh.  That is where the outsourcers stop.

9    This early stage model is then sent to GM's engineers in

10    Detroit, who then construct and complete the finite

11    element models."  In other words, there are some basic

12    meshing done, but that's not full vehicle modeling.

13    That's basic meshing.  Then it's sent to GM engineers in

14    Detroit who do the full vehicle modeling.

15            I want to take a look at that.  I can go, and I

16    have gone -- and GM can go and the Court can go to a

17    website called www.Optimalinc, O-p-t-i-m-a-l-i-n-c, .com.

18    And you will find, as I found, as GM I'm sure knows, that

19    this company claims to be the outsourcer, CAE outsourcer,

20    for General Motors.  The question is:  Do they only

21    provide the early meshing and then send it back to GM for

22    full vehicle modeling?  You see that that's not what they

23    say.  They say -- on the General Motors page it says,

24    "Optimal CAE has been in the business of providing CAE

25    services since 1986 and has pioneered the CAE methods now

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 11

 1   used by many of our customers."  Then they brag about

 2   getting awards from Ford.

 3          Then you go to another page, which is dedicated

 4   to the General Motors page.  And it says, "Optimal was

 5   selected as the single-source vendor for GM North America

 6   Operations, NAO, on-site CAE modelers.  This program

 7   solidified Optimal's position as a leader in CAE modeling

 8   and modeling training.  Given the dramatic success of

 9   this program, GM has also granted Optimal access to its

10   previously single-sourced outsourcing of CAE models."

11          You go down to the third bullet under that on the

12   webpage, and it brags about evolution and treat -- and

13   refinement of GM modeling standards.  This is the

14   technology and standards they claim is so super

15   top-secret.  "Refinement of GM modeling standards

16   including full vehicle modeling."  If outsource -- if the

17   Optimal Inc. site is correct, then one begins to question

18   whether or not GM has been shooting straight with the

19   Court and with the plaintiffs.

20          They then brag about creating a large internal

21   Optimal modeling team.  And then even more importantly

22   you go to the bottom of that page, and you see who else

23   they're modeling for.  They're modeling for Ford, and

24   they're modeling for Chrysler.  And they describe the

25   modeling programs for Ford and Chrysler in the same words

Daniel Pertile, et al. vs.                                                    Motion Hearing
General Motors, LLC, et al.                                                  October 30, 2015

Page 12

1    they use to describe the modeling program for General

2    Motors.

3           So one begins to wonder whether the concern here

4    is over the risk of -- pardon me -- of disclosure to

5    competitors or the concern is really over the risk of

6    disclosure to people who make claims for injuries due to

7    GM products.  We are -- we are required to sign a very

8    strict non-sharing protective order.  You wonder whether

9    or not Ford and Chrysler and General Motors when they go

10   to this specialist in doing full vehicle modeling is

11   subject to the same strict standards this Court has

12   imposed upon the plaintiffs here.

13          Let's now talk about something that I think the

14   Court was concerned about at the August hearing over the

15   telephone.  The Court asked a specific question:  "Is

16   this stuff cumulative of other information?  Why is this

17   important for the plaintiffs to obtain access to?"  First

18   of all, it is not cumulative.  We can't just call it the

19   best evidence like the Centurion and I think Morton case

20   that we cited say.  This is the only evidence of GM's

21   knowledge.  There is no other evidence available.

22          THE COURT:  Why aren't the tests -- the test

23   reports that come out of the FEA analysis -- or the FEM

24   analysis sufficient?

25          MR. GILBERT:  It's a good question.  Those test

Daniel Pertile, et al. vs.                                    Motion Hearing
General Motors, LLC, et al.                                October 30, 2015

Page 13

```
 1   reports -- the analogy that comes to my mind -- the test
 2   reports are a thimble full of information compared to the
 3   lake of information in the FEMs.  We address that very
 4   issue on page 2 of our brief and in the Vlahinos
 5   affidavit.  We can't know all that GM engineers knew by
 6   getting a written test report, first of all.  Secondly,
 7   we can't do our own simulations to see what test results
 8   were -- GM had available at the time it was making the
 9   important design and testing decisions for this vehicle.
10   The lake is the vast amount of information.  The thimble
11   full is what GM asks us to accept in lieu of the lake in
12   a written form that we can't use to see what GM was
13   looking at in their test results when they decided to go
14   forward with sale of this vehicle to the public.
15          Secondly, they suggest that we accept their 3D
16   CAD data.  And I don't know whether the Court wants more
17   explanation --
18          THE COURT:  I know what a CAD drawing is.
19          MR. GILBERT:  We've done a lot of ex- -- talking
20   about 3D CAD data.  If we took the 3D CAD data and
21   developed a finite element model from the 3D CAD data,
22   what we would get is, first of all, a very lengthy and
23   expensive process that Vlahinos -- Andreas Vlahinos has
24   addressed.  But secondly and more importantly, it would
25   not demonstrate what General Motors knew when it was
```

Page 14

 1   designing this vehicle.

 2          And I want to call attention to language from a

 3   case that another judge associated with this case signed.

 4   It's the case -- William Martinez was the district judge

 5   here in Colorado.  It involved a pain pump and shoulder

 6   surgery, and the defendants apparently managed -- what's

 7   the word for it?  They made the pain pump, and they were

 8   sued in both strict liability and negligence.  And they

 9   wanted certain information that the defendant says, super

10   secret, we can't give you that information.

11          Judge Martinez at page -- I have the West

12   report -- Westlaw report, and it's page 3.

13          THE COURT:  What's the citation?

14          MR. GILBERT:  I'm sorry.  It's 2012 Westlaw, WL

15   1378640.

16          Lindsey, do we have a clean copy of that case?

17          THE COURT:  That's all right.  I'm sure I can

18   pull it.

19          MR. GILBERT:  Okay.  We can get that for you if

20   you need it.

21          Judge Martinez remarked about the middle of his

22   order, quote, "What defendant knew or could have known

23   about the possibility of the injury that plaintiff

24   suffered is key to both plaintiff's negligence and strict

25   liability claims.  With respect to negligence, the

Page 15

1    Colorado Supreme Court has held when a manufacturer or

2    seller knows of or should know of unreasonable dangers

3    associated with the use of its product, it has a duty to

4    warn and" -- "or there might be a breach of that duty."

5           So Judge Martinez was very specific in finding

6    that even in strict liability cases the defendant's

7    knowledge was key.  Defendant's knowledge cannot be shown

8    or is certainly far inadequate to show by a written

9    report containing the thimble full of information, and it

10   certainly will not allow us to do our simulations.

11          THE COURT:  So, Mr. Gilbert, can you give me an

12   example of information that you're trying to get from the

13   underlying data that -- from the FEM analysis that you

14   can't get from the results?  So, for instance, I used to

15   do patent cases.

16          MR. GILBERT:  Yes.

17          THE COURT:  And we did FEA analysis on medical

18   devices.  And some of those analyses were if the heart

19   beats 10,000 times, when will this device fail?  Right?

20   So using an analogy or a specific example, what will this

21   data as opposed to the test results show you about the

22   design of the roof that you can't get from either the CAD

23   drawings or the test reports?

24          MR. GILBERT:  If I could just get my briefs.

25          THE COURT:  Sure.

Page 16

```
 1        MR. GILBERT:  Some things are tip of my fingers,
 2   and other things aren't.  They're at the tip of someone
 3   else's fingers.  Thank you.
 4        On page 2 we address that very issue, Judge,
 5   because it is an important issue.  And on page 2 of our
 6   recent brief, our reply brief, we talk about the
 7   inadequacy of the written analysis reports and then the
 8   CAD data.  And Dr. Vlahinos, because we thought it was
 9   important to make this more of a testimonial or
10   evidentiary showing, we had him do an affidavit.
11        And it says on page 2, "If plaintiffs were forced
12   to rely upon written reports, they would only know a
13   fraction of what GM knew at the time it was making
14   important design decisions.  Plaintiffs are entitled to a
15   complete understanding of GM's simulation results and
16   what the company learned from those simulations.  With
17   finite element files, full knowledge of GM simulations
18   can be created by running simulations and generating
19   outputs.  Those simulations will utilize the same data GM
20   engineers analyzed during product development."
21        In other words, we can see the test results they
22   were getting.  We can open up the FEM file, which we
23   can't do by opening up an analysis report, the thimble
24   full, because we don't know the load conditions.  We
25   don't know if there were other load conditions.  We don't
```

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 17

```
 1   understand everything they were doing as they marched

 2   forward to a final design.

 3          And then secondly, as we then point out a section

 4   of his affidavit, he talks about the small amount of

 5   information, the thimble full, available from the written

 6   test reports and what is needed with the full output data

 7   and talking about how stresses and strains can be

 8   reviewed on the various parts of the structure to examine

 9   how close the structure was to failure.

10          Then finally, we point out at the bottom of

11   page 2 and the top of page 3 we cannot only run the FEMs

12   for the preproduction, but there is a use for 3D CAD

13   data.  And it's not to create a new finite element model.

14   It's to use the final design CAD data to update easily

15   and inexpensively and quickly the existing FEMs.  And

16   that can be done, and then those can be run to show how

17   the truck as it's sold to the public performs.

18          I hope I've responded to your question, but that

19   is what our expert would like to do.  And that's why we

20   need the actual models run by GM so we not only

21   understand what they were seeing as far as weaknesses and

22   strengths, but then we can use the same 3D CAD data to

23   make design changes to the vehicle.  How can we make this

24   vehicle safer?  How can we make it stronger in the

25   pillars?  What can we do with the roof?  So that's what
```

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 18

 1  our expert pursuant to the protective order would be

 2  able -- will be able to do.  Has that -- I hope that's

 3  been directed to your question, Judge.

 4       THE COURT:  Well, I think that direct -- that was

 5  in response to my question.  I'm not sure that clarifies

 6  it for me, but I will -- I will think about that.

 7       MR. GILBERT:  Yes.  I ask that you think about

 8  it.  I want to very quickly address the tire cases that

 9  GM mentions on page 6.  The tire cases on page 6 of its

10  brief are not particularly helpful, and there's a reason

11  they aren't.  First of all, the tire cases kind of fall

12  into one of two categories.  Number one is someone is

13  asking for the skim-stock formula, kind of the Coca-Cola

14  formula.  And like the Coca-Cola formula, it's not going

15  to tell you anything about whether the product is

16  defective.  Everyone agrees.  You read all of these

17  cases.  And both the plaintiff and the defense agrees

18  that skim-stock formulas don't tell you anything about

19  the weakness of the tire, first of all.

20       Secondly, when the National Highway Traffic

21  Safety Administration evaluated the tires in about the

22  year 2000 for the Explorer rollovers, they eschewed the

23  skim-stock formulas in -- what's the word I want to use?

24  You give up one thing, and you choose to do another.

25       THE COURT:  They chose an alternative?

Daniel Pertile, et al. vs.                                                          **Motion Hearing**
General Motors, LLC, et al.                                                      **October 30, 2015**

Page 19

```
 1            MR. GILBERT:  Yeah, they chose -- they said the
 2    best way to test these physical tires was not using the
 3    skim-stock formula, which was useless.  But you have to
 4    look at the performance of the tire itself, and you
 5    compare the performance of the tire itself with the
 6    tires, pure tires like Firestone compared to Goodyear,
 7    Wrangler and Kumho.  So everyone in those tire cases,
 8    while the language may have been tried -- GM may have
 9    tried to shoehorn the language into the context or the
10    setting of this kind of a product case, it was a
11    completely different issue.  And no one thought that
12    defect could be shown by skim stock, first of all.
13            Secondly, the composition of the tire changes an
14    awful lot between when the skim stock is originally put
15    together as part of the tire because over age the
16    chemical composition of the tire changes.  A lot of that
17    has to do with vulcanization of the tire as they make the
18    tire so it adheres to the iron -- the copper treads --
19    threads in the tires.  It changes.  So knowing the skim
20    stock in 19 -- in 2007 isn't going to tell you anything
21    about the composition of the tire in 2015.  You have to
22    do a performance analysis.  There is no disagreement over
23    that.
24            Secondly, another category of cases for the
25    tire -- category of tire cases is plant inspections.  And
```

**Daniel Pertile, et al. vs.**
**General Motors, LLC, et al.**

**Motion Hearing**
**October 30, 2015**

Page 20

 1    the cases -- I think it is -- the Michelin versus Brown

 2    talked about plant inspections and how that's not a very

 3    adequate way of assessing or gauging a tire's defect

 4    because the plants change.  A plant that may have had a

 5    process in 2007, it changes over time.  And that's what

 6    the courts have found.

 7           The Long case that both parties have looked at in

 8    their briefing here is another example of -- that was a

 9    propane gas explosion where a woman who was housesitting

10    was burnt, and her lawyer wanted to inspect this

11    Pittsburgh plant to support a working theory.  The Court

12    said no, we will not allow you to shut down a plant in

13    Pittsburgh at a cost of more than $100,000 to see if your

14    working theory works out in the end.  So they wouldn't

15    allow that.  So some of these plant inspection cases,

16    they don't apply either.

17           THE COURT:  I want to take you back, though --

18           MR. GILBERT:  Sure.

19           THE COURT:  -- to the underlying data for the FEM

20    analysis.  So what kind of data are there that you're

21    looking for that isn't reflected by the test reports that

22    reflect what GM actually ran?  So, for instance, are

23    there different dimensions for -- or different materials

24    that are a part of the data?  I'm just -- I'm struggling

25    to understand -- don't worry.  I will ask GM similarly

**Daniel Pertile, et al. vs.**
**General Motors, LLC, et al.**

**Motion Hearing**
**October 30, 2015**

Page 21

```
 1   difficult questions about their positions.
 2            MR. GILBERT:  Thank you.
 3            THE COURT:  I'm trying to understand what your
 4   position is about what is in that data that the -- to me
 5   the reports show what GM did, what tests they ran and
 6   what results they got from the tests.  So the inputs that
 7   they used -- so, for instance, if they knew that
 8   increasing the diameter of the bar by .2 would result in
 9   X, you would see that in a test.  But the data itself
10   that they could have run .2, .3, .4, .5, I don't know
11   what you get from that.
12            MR. GILBERT:  Well, first of all, GM -- GM does
13   10,000 simulations, computer simulations, a year -- is it
14   a month or a year?
15            MS. BERG:  Month.
16            MR. GILBERT:  A month.  10,000 a month.  They
17   don't do physical testing.
18            THE COURT:  Uh-huh.
19            MR. GILBERT:  They do computer simulations,
20   10,000 a month.  They couldn't possibly wreck 10,000 cars
21   a month.  They'd go broke.
22            THE COURT:  Okay.
23            MR. GILBERT:  I hope they won't go broke, but
24   they couldn't do it.  It would be impossible to expect
25   that they would physically test, and it's the same --
```

Page 22

1          THE COURT:  I'm not asking you about physical

2     testing, Mr. Gilbert.  I'm asking you what does the data

3     tell you that the test results won't?  So, for instance,

4     you could get the data.  You could manipulate it in a way

5     that GM never manipulated it and come out with a result

6     that they never knew.  You could argue that they should

7     have known it or they should have done it that way, but

8     I'm not certain that demonstrates what they did actually

9     know at that time in a way that test results say we put

10    these inputs in, we got this test result.  That to me

11    shows me -- shows what they did.

12          So I'm just really -- I'm not saying that you're

13    wrong about trying to get this information.  I'm just

14    trying to understand what is the underlying FEM data get

15    you that you can't otherwise get?

16          MR. GILBERT:  The output data is critical.  We

17    don't know what they were seeing, and they don't have

18    reports for every output of every simulation they ran.

19    They probably ran thousands of simulations before they

20    built this physical vehicle.  The only way to know what

21    they were seeing in those simulations is not in a report

22    because they've offered one or two reports.  I think it's

23    one up to this point.

24          The only way to know what these thousands of

25    simulations were telling them is to see the finite

Daniel Pertile, et al. vs.                                                    Motion Hearing
General Motors, LLC, et al.                                                  October 30, 2015

Page 23

1    element model.  It's nowhere else.  It's the only source

2    of information.  It's not in any of the written reports.

3    It's not in the 3D CAD data.  3D CAD data represents the

4    final design, the dimensions.  I can go out with a ruler

5    and a tape measure and measure the final design, and I

6    can measure the thicknesses of the metal.

7              But the only way I can find what they were seeing

8    when they tested is the output data, and the only way I

9    can see that is in the model itself.  You can go to the

10   model, and they call them I think K files.  And in the K

11   files they have these test results, and they are not

12   willing to give us those test results.  And I think we're

13   entitled to see the same things they were seeing at a

14   time they decided to march forward with the design of

15   this vehicle.  And I apologize.  I'm not an engineer,

16   Your Honor.

17             THE COURT:  Neither am I.

18             MR. GILBERT:  And I apologize if I'm inartful on

19   some of this stuff.  But talking to Dr. Vlahinos, this is

20   what I understand from his affidavit, which we've

21   provided the Court.

22             THE COURT:  All right.  Thank you.

23             MR. GILBERT:  And I would prefer that Andreas

24   Vlahinos answer some of these rather than depending just

25   on my answers.

Page 24

 1              Next is I've already mentioned these FEMs are not

 2     cumulative --

 3              THE COURT:  So, Mr. Gilbert, just for timing

 4     purposes, I'm going to have you wrap up in about five

 5     minutes so that Mr. Mordarski can address it.

 6              MR. GILBERT:  Will do.

 7              THE COURT:  And then you'll have a chance for --

 8              MR. GILBERT:  Will do.

 9              THE COURT:  -- rebuttal.

10              MR. GILBERT:  I'll try and provide shorter

11     answers.

12              The 3D CAD is insufficient.  And you know why,

13     why according to us.  Because if we built a 3D CAD model

14     using 3D CAD and we built it, that would not be the model

15     that GM engineers were looking at when they made their

16     decisions.  Secondly, our obligation in addition to what

17     Judge Martinez said is to prove knowledge as a critical

18     part of the -- of the strict liability and negligence

19     claims.  We have to show alternative design, and we can't

20     show alternative design with something that we don't know

21     is being built.  We have to take what GM was designing,

22     what it had in its FEMs, and see if there were better

23     designs, stronger designs.

24              Our experts need them.  And the Centurion and

25     Master Palletizer cases discuss why that's important for

Page 25

```
 1    the experts, and V -- Dr. Vlahinos -- we call him Dr. V
 2    because it's easier to say V than Vlahinos.  But he says
 3    in his affidavit on about four or five -- I think it was
 4    five paragraphs why he needs -- and it's in the wording
 5    of the tire cases that seem to support an absolute need
 6    showing for the information.
 7            Another thing that cannot be overlooked --
 8    where's Kleinerman -- that cannot be overlooked is the
 9    language from Kleinerman versus U.S. Postal Service.  I
10    think this was from a postal tagging machine.  And it
11    says -- that's 100 FRD 66, 1983.  And in Paragraphs 5, 6,
12    and 7, the federal court noted, quote, "Although a
13    defendant may have a legitimate interest in protecting
14    its trade secrets, that interest must yield to the right
15    of the plaintiff to discover the full truth of the facts
16    involved and the issues in the case where the issues
17    cannot be fairly adjudicated unless this information is
18    available."  Then they refer to a balancing of the
19    plaintiff's need for disclosure and the defendant's need
20    for protection.
21            The defendants on page 5 cite all the competitor
22    cases which lead some courts to remark that the courts
23    are highly suspicious when competitors get into a big
24    food fight, for lack of a better expression, over one of
25    their competitors' trade secrets and processes.
```

Page 26

```
 1              So unless the Court has additional questions, I
 2    will cut short my presentation and perhaps respond to
 3    some of Mr. Mordarski's arguments.  But I think -- I hope
 4    I have demonstrated to the Court that this risk of
 5    disclosure is more about letting this stuff get into the
 6    hands of the plaintiff and not nearly as much as letting
 7    it get into the hands of the -- of its competitors as
 8    shown by its decisions to regularly expose itself to far
 9    greater risk of disclosure.  Thank you, Judge.
10              THE COURT:  Thank you.
11              MR. GILBERT:  Judge, I'm sorry, Dan --
12    Mr. Mordarski, I'm reminded --
13              MR. MORDARSKI:  You can call me Dan.
14              MR. GILBERT:  Thank you.  You can call me fast
15    (inaudible).
16              Ma'am -- Judge, I would like to offer the
17    webpages from the Optimalinc website, and I have -- I
18    have my marked-up copy with the stuff that's important to
19    me.  But I would be just as happy to give the unmarked
20    copy and pass it up to the Court with a copy to counsel.
21              THE COURT:  Mr. Mordarski, do you have any
22    objection?
23              MR. MORDARSKI:  We do because it's a hearsay
24    document.  It's nothing we've ever seen.  It's somebody
25    boasting about their abilities and their connections.
```

Page 27

1    It's not our statement.

2            THE COURT:  All right.

3            MR. GILBERT:  Will GM deny it?

4            THE COURT:  Well, we'll leave it.  It's not part

5    of the record right now.  We're proceeding on what's in

6    the record.  Go ahead, Mr. Mordarski.

7            MR. MORDARSKI:  Your Honor, thank you for

8    allowing us to be here today.  My colleague is very -- a

9    very good lawyer, a very skilled lawyer.  And his clients

10   are well represented here today.  I respectfully disagree

11   with his analysis of the burden shifting.  I think the

12   Centurion case and every district court case that's

13   followed that has indicated that the party seeking trade

14   secrets has the burden of proving relevance and need, and

15   that burden has not been satisfied in the motion.  We'd

16   also object, Your Honor, to the affidavit that was

17   submitted with a reply brief.  I think that violates the

18   standard because we didn't technically have a response --

19   an ability to respond.

20           But with those things said, if you do look at the

21   affidavit and you look at the reply brief and you look at

22   the motion, nowhere do they say they need this

23   information.  The affidavit doesn't say need anywhere.

24   It says all the things they could do with it or things

25   they think they could do with it.  But your question

Daniel Pertile, et al. vs.                              **Motion Hearing**
General Motors, LLC, et al.                          **October 30, 2015**

**Page 28**

 1   really goes at the heart of the issue.  What is that

 2   information, and why do they need it?  There's not a good

 3   answer for that.

 4         Because the reality is -- you've indicated you

 5   have some familiarity with finite element models.  At

 6   General Motors typically those models are used very early

 7   in the design phase, and it's an experimental phase.  So

 8   you're running iterations over and over and over and

 9   over.  So opening up that model will show you one

10   iteration.  It's one data point in time.  You can't

11   attach that data point to anything.  It's one data point,

12   as my colleague says, in the lake of information, maybe

13   in an ocean of information.

14         THE COURT:  But doesn't that give the plaintiff

15   one more data point of what GM knew about the design and

16   structure or the potential design and structure of the

17   roof?

18         MR. MORDARSKI:  But it doesn't connect to

19   anything.  So here's what that data point could be:  That

20   data point could be we like the way the design looks

21   right here.  So that's what it could be.  Or it could be

22   let's try something way out here exploratory, or it could

23   be something in between.  But there's no way to know

24   opening up that model now to say what that is.  You

25   can't -- there's not some kind of library where you could

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 29

1    say, oh, here's all the things that you ran with this

2    model.  So it doesn't give you any data as to what GM

3    knew.

4            THE COURT:  What about the K files that

5    Mr. Gilbert indicated?

6            MR. MORDARSKI:  That's not a term or a -- K file

7    is not something that we're familiar with.  So I'm not

8    sure what his expert is talking about.  This is a model

9    where if you could open it up and run it, you will get

10   that one iteration with old design files.  We know that

11   for sure.  We know that it was somewhere within the first

12   half of the design phase.  So it's not even in the second

13   half where we're getting close to finalizing the design.

14   So it's not giving anything of substance.  It's certainly

15   not something that they need, and we haven't heard that

16   they need it.  They haven't defined that as, boy, that's

17   a critical piece of data.

18           So what we haven't talked about is really what

19   the defect theory is because there's all types of

20   different defects that could cause injuries.  I won't try

21   to speak for Mr. Gilbert because I would not say it as

22   well as he could, but I'll show you what his website

23   says, I hope.

24           MR. GILBERT:  Your Honor, do I have the same

25   objection as counsel had to the Optimal website?

Page 30

1            MR. MORDARSKI:  This is his website.

2            THE COURT:  Whose website?  Mr. Gilbert's

3    website?

4            MR. MORDARSKI:  Yes.

5            THE COURT:  I'm happy to look at the website.

6    I'm going to be honest with you.  I was up here looking

7    at the Optimal Inc. website.  I don't think that they're

8    part of the record, but you can certainly proceed.  And

9    I'll note your objection, Mr. Gilbert.

10           MR. GILBERT:  Thank you, Judge.

11           MR. MORDARSKI:  So, Your Honor, we have a

12   webpage -- a page to his website, and it talks about a

13   roof defect theory.  The defect theory is basically this:

14   General Motors and most auto manufacturers have a design

15   parameter, and for General Motors we set a design

16   parameter of what the roof's strength should be.  The

17   plaintiffs will say it should have been stronger.

18           This isn't a defect theory that something broke,

19   something exploded, something didn't work the way it was

20   supposed to.  It's a dispute about a design theory.  So

21   our standard is here.  Our vehicle exceeded the standard.

22   And the plaintiffs will argue, well, the standard should

23   have been here.  So this is not a situation where they

24   have to dig in there and find out what we know.  Here's

25   what we knew:  We decided on this standard.  You're

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 31

```
 1   saying that this standard is not strong enough.  Okay.
 2   So that's what we're going to argue in front of the jury.
 3   But it's not like something broke.  It's not like
 4   something didn't work the way it's supposed to.  It's a
 5   difference in design philosophy.
 6        THE COURT:  Does the FEM model tell you that at
 7   this standard it's going to break, you know, three times
 8   out of every 10,000?
 9        MR. MORDARSKI:  No, no, because that's not how
10   you do design.  You set a parameter.  As long as your
11   vehicle exceeds that parameter, you've set -- you've
12   satisfied the standard.  So these aren't things like
13   fatigue studies.
14        THE COURT:  Uh-huh.
15        MR. MORDARSKI:  So you'd run something a thousand
16   times, 10,000 times.  And at 10,001 it breaks.  So you
17   know, okay, that's kind of the limits.  This is here's
18   the standard.  Okay, we've met it.  We move on.  So it's
19   not -- you know, there's not the smoking gun in there
20   that, you know, you see in some of these other cases
21   where you're trying to find out why the thing didn't work
22   the way it's supposed to.  This works the way it was
23   supposed to.  They just don't think the standard is
24   correct.
25        So that's why when you go back to that question
```

Page 32

 1  that you asked originally -- what is that data and why do

 2  you need it -- that's where the argument falls apart.  So

 3  that -- for us that kind of really addresses that need

 4  issue, and I don't think that they've met the burden.

 5  What I really think the argument is about, Your Honor, is

 6  not what GM knew but whether the plaintiffs can use this

 7  to create an alternative design.

 8         Again, Mr. Gilbert's website says they use

 9  computer modeling to redesign a minivan in a manner that

10  would have prevented the accident.  I truly believe this

11  is what they're going for.  They want to -- they want to

12  use it to show their alternative design.  So there are

13  alternatives to do that.  First, they don't need to use

14  finite element models to prove an alternative design.

15  And Mr. Gilbert's been doing this longer than I have.  He

16  has proved many alternative designs without finite

17  element modeling.  So you can do it without it.

18         But if you really want to use that technology,

19  he's got an expert that can create those models.  That

20  expert is -- not only does he have an outside expert.

21  He's got an engineer in his office, which is truly unique

22  for a plaintiff's firm.  And I commend him for having

23  that backup.  But he indicates on his website his office

24  has created simulations for other cases.  So they know

25  how to create these simulations, and certainly they --

Daniel Pertile, et al. vs.                                          **Motion Hearing**
General Motors, LLC, et al.                                      **October 30, 2015**

```
 1   their expert knows.
 2          And this is where we start to get very, very
 3   concerned about the harm because the expert's website
 4   goes in great detail about all the computer modeling that
 5   he does.  That's what he does.  That's what he's done for
 6   the last 30 years.  He says that's the primary tool that
 7   he uses to evaluate designs.
 8          This is a person that makes his living on
 9   doing -- using those types of secrets that are in our
10   models.  Not only does he do that for clients, but he
11   teaches at a university.  And he provides private
12   training on computer modeling to clients.  This is
13   someone that is deep into this area, not just litigation
14   consulting.  This is where he makes his money on
15   everything that he does.  So when we talk about
16   competitors, he definitely is a competitor, not in
17   building vehicles, but in building computer models.
18          THE COURT:  But GM is not competing in
19   building -- it's not selling a computer model.
20          MR. MORDARSKI:  Very true, very true.
21          THE COURT:  And so --
22          MR. MORDARSKI:  But --
23          THE COURT:  So how is he -- I mean, are you, in
24   fact, then arguing, Mr. Mordarski, a theory of inevitable
25   disclosure, that once he has it in his head he could go
```

Daniel Pertile, et al. vs.                                    **Motion Hearing**
General Motors, LLC, et al.                                   **October 30, 2015**

Page 34

1    consult for someone who could compete against GM?  But

2    you're not the -- your client is not in the industry of

3    computer modeling.

4              MR. MORDARSKI:  In a way it is.  We don't sell

5    our computer models, but they're incredibly valuable

6    tools.  So we have it in house, but those help us create

7    better vehicles and faster.  So some of Dr. V's clients

8    are our competitors.  He lists them on his website.  He

9    lists Ford Motor Company, Toyota, Allison Engine Corp.

10   There's a page where he actually uses all their logos.

11   We've got Ford, Detroit Diesel, Delphi, Chrysler,

12   Rolls-Royce.

13             THE COURT:  That may be a violation of their IP

14   policy.  I don't want to --

15             MR. MORDARSKI:  It might be.

16             THE COURT:  -- get into that.

17             MR. MORDARSKI:  But those are our competitors.

18   Now, the one thing we know about Dr. V is that he

19   publishes a lot.  He publishes in this area a lot, and

20   we've heard that he works for the government and that he

21   knows about secret -- secrecy in the government.  On his

22   website he lists -- he says that he published over a

23   hundred articles.  He lists about 30.  Many of them are

24   for his work with the government.

25             So as we go down the list, there's General

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 35

1    Dynamics, who does military vehicles, Department of

2    Energy.  Then we get down to his publications with Ford

3    Motor Company relating to the finite element modeling

4    that he did with Ford Motor Company.  Those are very

5    serious concerns for our client.  This is not just a

6    litigation consultant who's jumping from case to case.

7    This is somebody very active in the automotive design

8    field.

9           So when you look at his affidavit, he says the

10    reason that he doesn't want to make his own models is

11    that he's concerned that he will be attacked in the

12    courtroom, that there will be a Daubert motion.  If he

13    uses our model, I can guarantee you there's going to be a

14    Daubert motion because you can't take an old model, put

15    in new CAD, and do all those fixes and have a

16    scientifically valid model.  If you do, it will take you

17    way longer than creating a model from scratch.  It's

18    going to have all kinds of bugs and all kinds of

19    problems.  If scientifically you are going to create a

20    finite element model to prove an alternative design, you

21    have the updated CAD.  And you would put those parts and

22    pieces together based upon your own knowledge.  Taking an

23    old one and trying to update it, that's not going to

24    provide a scientifically valid model.

25           One of the things that my colleague talked about

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 36

1    was the skim-stock formula cases where, you know,

2    plaintiffs have tried to get the formula for the tires

3    because the tires failed.  And those cases said, well,

4    that formula is not going to tell you what the defect

5    was.  That's exactly what we have here.  These models are

6    not going to tell you what the defect was because the

7    defect is a concept.  We believe our standard is

8    appropriate.  They don't.  They think the standard should

9    be up here.  The model itself isn't going to tell you one

10   way or another about that standard.  The standard is what

11   it is.

12          Now, we have reports that say that we meet our

13   standard.  And if they don't -- if they believe we don't

14   meet our standard, boy, that would be good evidence for

15   them.  But the model is not going to provide that.  So

16   there's nothing in that model that's going to tell them

17   anything about the defect.  And my colleague even talked

18   about the fact that those cases say that tires change.

19   So looking at the formula doesn't matter.  Looking at the

20   end tire is what matters.

21          I think that applies here too.  Looking at our

22   design and the reason we selected that design is what the

23   jury is going to hear about and what the experts are

24   going to fight about and all the medical evidence and all

25   that kind of stuff.  So that model isn't going to really

Page 37

```
 1   affect that one way or another.  If you want to know what
 2   GM knew, you're going to know that from the reports.
 3   You're going to know that from meeting-minute-type
 4   materials that have been produced.  But that -- but that
 5   model is not going to tell you any of that.
 6        THE COURT:  Would the model tell you what inputs
 7   Ford (sic) selected in running the models?  So, for
 8   instance, would it tell you the data points of what
 9   factors it used to run whatever design?
10        MR. MORDARSKI:  It will contain data on an early
11   design.  It will contain data about the parameters that
12   that engineer decided to use to simulate things.  So it's
13   going to tell you about how they simulate.  It's not
14   going to tell you about how they decided what the
15   standard was or whether they could have or should have
16   made it stronger and those policy-type things.
17        THE COURT:  And what's going to tell the
18   plaintiffs that?
19        MR. MORDARSKI:  Those are the reports and the
20   testimony, things like that, as to why they chose that.
21   Because in automotive design -- I'm sure Mr. Gilbert will
22   agree -- there are tradeoffs.
23        THE COURT:  Sure.
24        MR. MORDARSKI:  Everything is on a spectrum.  So
25   you can make a car as stiff and strong as a tank, but
```

Page 38

1    it's going to have tradeoffs on other types of crashes in

2    the body and things like that.  So we believe -- and I

3    think other manufacturers do too -- that we're at the

4    right standard.  I certainly understand the plaintiffs'

5    argument that the standard should be higher, but none of

6    that is going to come out of the model.

7         THE COURT:  Will the model tell you what results

8    would happen with those different tradeoffs?

9         MR. MORDARSKI:  No, no, no, no.  You could get an

10   engineer to create a model and run a bunch of different

11   iterations, and then I think that's what their expert is

12   saying he wants to do.  You could do that, but this model

13   is not going to do that for you.  So to do that he would

14   take the CAD, he would create the model, and then he

15   would run those iterations.  And he would say, okay, if

16   we did it this thick, you'd get this result.  If we did

17   it this thick, you'd get this result.

18        So he can do that.  He just can't do it with our

19   model because it has the old CAD and the old technology

20   on those types of things.  He has to update all of that,

21   which would take an incredible amount of time and likely

22   not even produce the result that's valid once you get

23   there.  That takes a much longer effort to get there than

24   creating the model from scratch.

25        THE COURT:  So I guess one of the things I would

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 39

 1   like you to address is this concept if it is not going to

 2   yield what he wants it to yield --

 3           MR. MORDARSKI:  Yes.

 4           THE COURT:  -- and it's old technology, then what

 5   is the concern that your -- that his expert would then

 6   have this technology and somehow get some competitive

 7   advantage?

 8           MR. MORDARSKI:  That's a great question.  And

 9   some of those issues get blurred in the briefing.  The

10   old technology is the old CAD.  The secrets that we're

11   concerned about are not in the CAD.  They're in the

12   modeling techniques.  So those modeling techniques that

13   were used ten years ago are still being used today.  Some

14   of the very preliminary modeling techniques are still

15   used today and are still very, very secret, very, very

16   competitive.  Some of those things are, for example, how

17   you simulate material properties.  So when you get the

18   CAD, the CAD will tell you what the component is made of

19   the type of steel.

20           THE COURT:  Yes.

21           MR. MORDARSKI:  When you create a finite element

22   model, you have to model that.  You have to find a way --

23   and it takes engineering knowledge and skill and quite

24   frankly a lot of trial and error and those kinds of

25   things to get it perfected, to get it just right.

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 40

1    Everybody in the industry that makes that knows that.

2    Everybody is trying to get that closer and closer and

3    closer to the reality.

4         So those secrets are the secrets that we're

5    concerned about.  We've already produced the CAD.  We

6    think that could be protected by a protective order.  But

7    those secrets can't because once that's let out, you

8    can't -- with all do respect to Dr. V, even if he wanted

9    to, he can't erase his memory.  This is a

10   methodology-type thing as opposed to a single-fact-type

11   thing.

12        So in the IP world, you know, you often have

13   protective orders that have attorneys' eyes only.  So the

14   clients -- the two clients aren't seeing the secret

15   information.  That doesn't work here because the

16   competitor is Dr. V.  He's the guy that works in the

17   industry.  He's the guy that's trying to sell his

18   computer models to Ford and Chrysler and everybody else.

19   He's the one that's out publishing in that area.

20        When he gets those secrets, he's going to have a

21   better knowledge base.  He's going to create better

22   models.  He's going to create better models for our

23   competitors.  He's going to have better things to sell

24   when he trains clients.  He's going to have more things

25   to publish.  The more he can explain his advanced

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 41

```
 1    techniques, the more he can be in demand in the industry.
 2         THE COURT:  But isn't that true for all of your
 3    engineers that work on this?  I mean, you know, let's say
 4    Ms. Lu decides tomorrow that she would prefer to work for
 5    a different company.
 6         MR. MORDARSKI:  Sure.
 7         THE COURT:  She might have a non-compete or a
 8    non-solicitation, but she's still going to have that
 9    knowledge.
10         MR. MORDARSKI:  In some respects, yes, I will
11    concede that.  There are some of those secrets that she
12    will take in her head.  Some will be in the model, and
13    you'll need the model to have them because you couldn't
14    memorize all of them.
15         THE COURT:  Right.
16         MR. MORDARSKI:  But he will have that.
17         THE COURT:  But he has to give it back at the end
18    of the litigation.
19         MR. MORDARSKI:  And there's a fine line there.
20    So let's talk -- now we're in a digital age, things are
21    very, very fuzzy.  So what some things we've heard of
22    experts doing -- we know this happened to Ford several
23    years ago.  They produced in native format some very
24    sensitive technical data.  The expert got it in
25    litigation, changed a couple pieces of the data, and then
```

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 42

1    said, this is my data now.  It's not Ford's because I

2    changed it.  That expert then published it and put it in

3    the public forum.  It was Ford's data except a couple

4    little changes that she made.  So now Ford's data and her

5    two changes are now in the public record.

6         When you get a model and you change it, it

7    becomes a new model.  So --

8         THE COURT:  So what if the model was hosted on a

9    third-party computer and not given to the expert on a

10   flash drive?

11        MR. MORDARSKI:  Then he's still going to have

12   access to those secrets.  So here's what -- here's

13   what he -- there's about 2,000 components in the model.

14   He has to go line by line for each component and check to

15   see if it's the updated CAD or not.  So line by line for

16   each one of those.  Then he's going to check each one of

17   the nodes and the mesh to make sure you're producing a

18   scientific model.

19        THE COURT:  Okay.

20        MR. MORDARSKI:  He's going to be deep into every

21   single one of those codes.  He produced in his affidavit

22   just a one page of those, and you could see he identifies

23   what each one of those things are.  He knows what those

24   codes are.  They're -- this is not like somebody just

25   kind of running the model.  He's got to be deep into it

Daniel Pertile, et al. vs.                                              Motion Hearing
General Motors, LLC, et al.                                         October 30, 2015

Page 43

 1    knowing what those codes are, you know.

 2          And again, this is his job.  He is selling his

 3    ability to create valid and sophisticated modeling.

 4    That's what he does.  He -- now he gets into the model

 5    and he says, oh, I see how they do that.  Okay.  And then

 6    he looks at the next code, and those start to accumulate.

 7    That's a very valid concern.

 8          What the affidavit says -- the affidavit says

 9    that there are -- there are four things that he thinks he

10    can get out of the model.  One is the geometry of the

11    parts.  One is the thickness.  One is the connection of

12    the parts and the material properties.  All four of those

13    things come from the CAD.  He's got all four of those

14    things.  So even his affidavit doesn't say that he needs

15    anything that he doesn't already have.

16          Again, we go back to the need.  If -- the

17    standard has to be something more than a want because

18    that's kind of what general discovery is anyways.  So the

19    need, the necessity, has to be something higher.  So

20    whether you -- this Court follows what other courts have

21    said on that standard, it's got to be something more than

22    just here's what I could get from the model.

23          There's been no -- no proof of need.  There's

24    been no demonstration of need, not in the affidavit,

25    which again we object to, not in the briefing.  There's

Page 44

1    been suggestions of what they could do or might be able

2    to do, but they don't even -- they can't articulate the

3    knowledge part of things or what GM knew because you

4    really can't show what GM knew.  It isn't going to tell

5    what GM knew during the design phase.

6            The other one point that I think is important to

7    at least address preliminarily is when we talk about

8    discovery we talk about data about the vehicle when we're

9    talking about automotive product liability.  We have

10   produced that data.  We agree that's essential to the

11   litigation.  They're not asking for vehicle data.

12   They're taking sort of a step away from that and saying

13   we want data that's not from the vehicle but from tools

14   that you used.  That's really not part of what discovery

15   is.

16           Again, it moves one step away from that need

17   burden that the plaintiffs have.  You know, we get -- we

18   get down to this sort of slipperily slope of because they

19   have better tools than us we ought to be able to use

20   their tools in litigation.  That's really never been a

21   philosophy or a principle of discovery in litigation.  So

22   again, that goes to the fact that this really isn't a

23   need.  It's a want.  If they really, really want to use

24   finite element modeling, they can do that.  They can

25   build it, and it will be much more valid than taking ours

Daniel Pertile, et al. vs.                                          Motion Hearing
General Motors, LLC, et al.                                          October 30, 2015

Page 45

 1    and trying to change it.

 2            Your Honor, if you have any other questions I'll

 3    be happy to answer them.

 4            THE COURT:  I don't.  Thank you, Mr. Mordarski.

 5            MR. MORDARSKI:   Thank you, Your Honor.

 6            THE COURT:  Mr. Gilbert?

 7            MR. GILBERT:  Yeah, I have very, very little.  I

 8    wonder if all of this discussion was taking place at

 9    General Motors the day and week they decided to start

10    outsourcing full vehicle modeling with a company that was

11    doing the same thing with their competitors.  I wonder

12    how much of this conversation was taking place at General

13    Motors when they decided to send their engineers

14    worldwide and throughout the country discussing their

15    modeling techniques and processes.  I doubt very much of

16    it at all was happening.

17            Their concern -- and I respectfully say this --

18    their concern is not keeping this information out of the

19    hands of their competitors.  Their concern is we will not

20    allow people who are injured by our products to have this

21    information.

22            And I also feel a little compelled to defend

23    Dr. Vlahinos.  He's published a lot, but you look at

24    where he's published.  SAE, they publish in SAE as well.

25    He has Ford's permission.  He's not violating protective

Page 46

1    orders when he publishes Ford materials, and it's not

2    secret anyway.  This stuff is not secret.  The

3    competitors know what GM is doing.  GM knows what the

4    competitors are doing.

5            THE COURT:  But you have stipulated that these

6    FEA modeling are trade secrets.

7            MR. GILBERT:  Yes, I have.  But --

8            THE COURT:  So that issue seems to me,

9    Mr. Gilbert, to be off the table.  So now that there's a

10   stipulation by the parties that these are trade secrets,

11   then the inquiry before the Court is really what to do

12   about the production or non-production.

13           MR. GILBERT:  And that's what I was really

14   addressing.  I'm addressing the first prong of Centurion.

15   What is the risk of disclosure?  And respectfully, I

16   suggest that the risk of disclosure is not very great

17   because they regularly and voluntarily expose themselves

18   to that risk.  And the need is tremendous.

19           We can't do, for example -- I think some of what

20   he said was a little misleading.  We can go into their

21   input files, their K files.  They probably don't save

22   their output files.  We can go into those K files, and we

23   can change the load to see what they were seeing when

24   we -- okay, now let's apply a thousand pounds.  Will

25   these meshes change at all?  Will it alter the properties

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 47

 1  of the meshes?  Will it start to collapse the pillars?

 2  Will it collapse the roof?  We can do all that.

 3          THE COURT:  But how would that be relevant if

 4  they themselves didn't do that?

 5          MR. GILBERT:  We want to show -- I think they

 6  did, first of all.  But even if they did not do it, we're

 7  entitled to know what would happen with their model if

 8  they changed the load conditions.  How close were they to

 9  failure?  What would have to have been done to change

10  that risk of failing this product by making it a little

11  stronger?

12          And again, as Judge Martinez pointed out in

13  Kleinerman, the knowledge of the defendant -- that was

14  the pain pump case -- the knowledge of the defendant is

15  the critical piece of information we have to prove.

16  There is no other source of that knowledge, none.  And

17  that's why we want it.  But it's not just that we want

18  it.  We need it because that's the only thing that's

19  available to us.  Thank you, Judge, very much.

20          THE COURT:  Thank you.  Mr. Mordarski, anything

21  else?

22          MR. MORDARSKI:  I will be even more brief.

23  That's kind of like when a lawyer says I have one more

24  question at a deposition.

25          I think, Your Honor, I'm willing to -- happy to

Daniel Pertile, et al. vs.
General Motors, LLC, et al.

Motion Hearing
October 30, 2015

Page 48

1    address the outsourcing issue and all those things.  I

2    think we addressed it pretty well in the affidavit, in

3    the briefing.  But the outsourcing only is at the very

4    preliminary level.  It's a little bit more cost efficient

5    to have that done in a certain way.  But the secrets that

6    we're addressing here are all put in once the models get

7    to General Motors.

8             The issue of trade secrets in publications and

9    presentations is again addressed in the affidavit and in

10   the briefing.  But essentially General Motors has very,

11   very strict guidelines as to what gets published.  They

12   have a multilevel review of papers and presentations to

13   ensure that secrets are not allowed out.  And especially

14   with computer modeling, they do not and are never

15   permitted to indicate what's in the model.  They will at

16   times present on what they've been able to do with the

17   model but not what's in the model or how the model get

18   there -- got there.  So again, all those things are in

19   the brief.  I don't -- unless you have any questions, I

20   don't think I need to hammer that anymore.

21             THE COURT:  I don't.  Thank you very much.

22             MR. MORDARSKI:  Thank you.

23             MR. GILBERT:  I don't have anything more to say.

24             THE COURT:  All right.  So Docket Number 87, the

25   motion to compel plaintiffs -- the plaintiffs' motion to

Page 49

```
 1   compel production of General Motors finite element models

 2   for the GMT 900 Series is submitted, argued, and taken

 3   under advisement.  We will get an order out as quickly as

 4   possible on this issue.

 5          Are there any -- I am trying to do this, but I

 6   wasn't able to.  Are we running up against any deadlines

 7   that you all are concerned about with respect to

 8   depositions or -- I know your discovery schedule is

 9   fairly extended in this case, but I want to make sure I

10   was at least asking the question.

11          MR. MORDARSKI:  I wouldn't actually be the good

12   person to ask on that.  We have other lawyers who are

13   actually going to be handling that.  But Jim, I don't

14   think we're --

15          MR. GILBERT:  It's (inaudible) to know.

16          MS. DIERUF:  I don't think so at this time, Your

17   Honor.  I think we're running okay with the schedule.

18          THE COURT:  All right.  So we will obviously try

19   to get to this as quickly as possible, but I do believe

20   that since this is such a critical issue for both sides

21   that we will issue something written as opposed to doing

22   something orally.  And that way you can, if appropriate,

23   raise it to the presiding judge for further

24   consideration.

25          All right.  Thank you very much.  Have a great
```

Daniel Pertile, et al. vs.                                              **Motion Hearing**
General Motors, LLC, et al.                                          **October 30, 2015**

**Page 50**

1    weekend.

2              MR. MORDARSKI:  Thank you, Your Honor.

3              MS. DIERUF:  Thank you, Your Honor.

4              THE COURTROOM DEPUTY:  All rise.

5          (Whereupon, the within hearing was then in

6    conclusion at 2:49 p.m.)

7

8              I certify that the foregoing is a correct

9    transcript, to the best of my knowledge and belief

10   (pursuant to the quality of the recording) from the

11   record of proceedings in the above-entitled matter.

12

13

     _____
14   /s/ Deborah VanDemark            November 11, 2015
     Signature of Transcriber             Date
15

16

17

18

19

20

21

22

23

24

25