**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-0518-WJM-NYW

DANIEL PERTILE, and
GINGER PERTILE,

      Plaintiffs,

v.

GENERAL MOTORS, LLC, a Delaware limited liability company,
TRW VEHICLE SAFETY SYSTEMS, INC., a Delaware corporation,
KELSEY-HAYES COMPANY, a Delaware corporation,

      Defendants.

---

### ORDER GRANTING DEFENDANT KELSEY-HAYES COMPANY'S
### MOTION FOR SUMMARY JUDGMENT

---

In this personal injury/product liability action pending under the Court's diversity jurisdiction, 28 U.S.C. § 1332(a), Plaintiffs Daniel and Ginger Pertile bring suit against Defendants General Motors, LLC ("GM"), TRW Vehicle Safety Systems, Inc. ("TRW"), and Kelsey-Hayes Company ("Kelsey-Hayes"), for claims including strict liability, negligence, breach of warranty, violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 *et seq.*, and loss of consortium.  (*See generally* ECF No. 254.)  Now before the Court is Defendant Kelsey-Hayes's Motion for Summary Judgment.  (ECF No. 187).  Because Plaintiffs have failed to muster evidence from which a reasonable jury could find that a product component manufactured by Kelsey-Hayes was defective, the motion is granted.

### II. LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc*., 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

However, "[t]o survive summary judgment, a nonmoving party must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof." *Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1233 (10th Cir. 2016) (internal quotation marks omitted). A party responding to a motion for summary judgment must therefore "ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record," *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004), and the Court is not obliged to "comb the record" to identify factual disputes or to make a party's case for it, *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000).

## II. BACKGROUND

The following facts relevant to the present motion are undisputed where not

attributed or noted otherwise.

This case arises from a single vehicle rollover accident, in which Plaintiff Daniel Pertile was injured, near Vernal, Utah, on February 25, 2013 (the "Crash"). (*See generally* ECF No. 254 at 3–5.)[1] Among other theories of liability, Plaintiffs allege that "Kelsey-Hayes designed, manufactured, and supplied an original equipment electronic stability control ('ESC') system to General Motors for use in the subject vehicle," (*id.* at 3–4), and that the ESC system was defective and unreasonably dangerous. They proceed against Kelsey-Hayes on claims of strict liability, negligence, breach of warranty, violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 *et seq.*, and loss of consortium. (*See* ECF No. 31 ¶¶ 11 & 90–118.)

It is undisputed that the vehicle in which Mr. Pertile was injured was equipped with an ESC system, which GM calls "Stabilitrack." (ECF No. 187 at 2, ¶ 3.) This system works to improve vehicle stability by detecting and reducing traction. (*Id.* 2 ¶ 4; ECF No. 218 at 3, ¶ 4.) It functions by tracking driver inputs such as steering and braking, and by monitoring vehicle dynamics, including wheel speeds and directions. (ECF No. 187 at 2, ¶ 5.) Those inputs are communicated to an electronic control module (the "control module" or Electronic Braking Control Module ("EBCM")), and the system will, in certain circumstances, initiate braking on one or more of the vehicle's wheels to assist the driver in regaining or maintaining control. (*See* ECF No. 187 at 4,

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which often differs from a document's internal pagination, as is true in documents with prefatory materials, and in transcript excerpts. Strangely, it is also true of the Pretrial Order submitted by the parties, which begins its pagination with 5, rather than with 1. (*See* ECF Nos. 237 & 254.)

3

¶ 5; ECF No. 218 at 3, ¶ 5.)[2]

As relevant here, Kelsey-Hayes provided components of the ESC system including the control module. (*See* ECF No. 187 at 2, ¶ 6.)[3] However, Kelsey-Hayes did *not* supply the sensors which provided the data inputs to the control module. (*See* ECF No. 187 at 3, ¶ 11.)[4]

---

[2] Plaintiffs' ESC expert, Mr. Steven Loudon, more specifically describes the operation of ESC as follows:

> [ESC] functions to detect when the vehicle is beginning to skid or spin. It will then use the brake control system and the engine management system to correct the skid or spin, allowing the driver to regain control of the vehicle.
>
> * * *
>
> ESC systems are designed to detect that the vehicle is or soon will be operating outside of the stable operating envelope and will take action to bring its operation back into the stable region. It does this by developing counter-acting yaw torque in the vehicle by applying one or more individual brakes. The main task of [ESC] . . . is, however, to limit the slip angle of the vehicle . . . in order to prevent vehicle spin. Vehicle slip angle is the vehicle angle that represents the difference between the direction the vehicle is pointing and the direction that it is moving.

(ECF No. 198-8 at 10, 13 (internal quotation marks and citation omitted).) Kelsey-Hayes Chief Engineer and Fed. R. Civ. P. 30(b)(6) designee, Deron Littlejohn, offers a similar summary:

> ESC is a computerized technology that improves vehicle stability during operation by detecting and reducing traction loss. ESC applies braking pressure—without driver braking input—to individual vehicle wheels in order to align that vehicle's position consistent with driver steering input. In other words, ESC uses automatic braking to mitigate probable steering control loss when a vehicle is not going in the direction the driver is steering.

(ECF No. 187-1 ¶ 4.)

[3] *See also* ECF No. 187-3 at 17 (Mr. Littlejohn, testifying that Kelsey-Hayes "was sourced as the ESC modulator supplier"); *id.* at 20 (testifying that Kelsey-Hayes was "design responsible for the modulator itself, the electronic control that goes on that modulator, and then the software that goes into that to make the system operate").

[4] Kelsey-Hayes states as a fact that it did not supply the sensors, citing testimony from Mr. Littlejohn. (ECF No. 187 at 3, ¶ 11; ECF No. 187-3 at 17–18 (testifying that GM sourced

4

The parties generally agree that functioning ESC systems provide substantial safety benefits. In addition, Plaintiffs' ESC expert, Mr. Loudon, has testified that the ESC products provided by Kelsey-Hayes in this case met all federal and industry standards (ECF No. 187 at 2, ¶ 8; ECF No. 218 at 3, ¶ 8), and that "when the system was working, it worked flawlessly" (ECF No. 187-4 at 8).

However, Mr. Loudon also concluded—and Kelsey-Hayes does not dispute—that the vehicle's ESC system was disabled and "was not active during this crash." (ECF No. 187-4 at 17, 19.) More specifically, Mr. Loudon opines that "this vehicle ha[d] a history of random intermittent faults that directly affect[ed] the

_____

the steering wheel angle sensor from another company); *id.* at 19 (testifying that Kelsey-Hayes did not provide GM with "a steering sensor," but that "[t]hey [*i.e.*, GM] tell us what type of steering angle sensor is likely to be on the vehicle, and we confirm that our electronics and software can be compatible with it," and that "[a] lot of times we [Kelsey-Hayes] don't find out until after we're sourced" what sensor(s) would be on the vehicle.) In violation of the undersigned's requirements for summary judgment briefing, Plaintiffs neither admit nor deny this fact, and do not cite any contradictory evidence. *See* WJM Revised Practiced Standards, III.E.4 (party opposing summary judgment must admit or deny factual recitations, and give a "factual explanation . . . and a specific reference to admissible evidence in the record supporting the denial"). Instead, Plaintiffs state only that they "agree" with Kelsey-Hayes's characterization of Mr. Littlejohn's testimony but have "no independent information" as to its accuracy. (ECF No. 218 at 3, ¶ 11.) This espoused lack of "independent information" does not demonstrate a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c) (party asserting a fact is genuinely disputed must support its assertion by reference to materials in the record); *see also Cross*, 390 F.3d at 1290 ("it is the responding party's burden to ensure that the factual dispute is portrayed with particularity"); *Christy*, 810 F.3d at 1233 (non-moving party must set forth specific facts establishing a genuine issue for trial); WJM Revised Practice Standards III.E.4. ("the opposing party may not deny for lack of knowledge"). In any event, Plaintiffs do not argue that summary judgment should be denied because a trial is required on the question of whether Kelsey-Hayes manufactured the sensors (particularly the steering wheel angle sensor). The Court accordingly treats this issue as conceded and finds that no genuine factual dispute remains on this issue.

Similarly, Plaintiffs respond to other facts alleged by Kelsey-Hayes and supported by deposition only by stating that Plaintiffs "agree" that the cited testimony was offered, but offering no citation to any contradictory evidence. (*See, e.g.*, ECF No. 218 at 3–4, ¶¶ 7, 11, 13, 15, 17.) This is also insufficient to meet Plaintiff's burden in establishing the existence of a genuine factual dispute. *See Christy*, 810 F.3d at 1233. Accordingly, since Plaintiffs have waived their opportunity to contest these facts, the Court treats them as undisputed.

functioning of the [ESC] system," and that "the ESC [warning] light was intermittently and randomly turning on and disabling the ESC function." (ECF No. 218-2 at 34.) He reached these opinions based on his review of 11 diagnostic fault codes that were recorded in the vehicle's system after the Crash. (*See generally id.* at 22–34.) Based on this review, he concluded that "three (3) faults . . . we[re] active in the ignition cycle of the accident and prevented the ESC system from being available to the driver." (*Id.* at 34.)

As to why these faults occurred, the ESC system reports diagnostic faults when one of the data input sensors provides unreliable data to the control module. (ECF No. 187 at 34, ¶ 12; ECF No. 218 at 4, ¶ 12.) Testimony from Kelsey-Hayes's Rule 30(b)(6) designee establishes that the ESC control module responds to such faults by disabling the ESC system, either until the "the fault corrects itself" (for certain "latched type" faults), or until the vehicle's next ignition cycle (for other "ignition latched" faults). (ECF No. 187-3 at 15; *see also* ECF No. 187 at 3, ¶ 13; ECF No. 218 at 4, ¶ 13.)

Given the particular data in this case, Plaintiff's expert, Mr. Loudon, testified in particular that the vehicle's steering wheel position sensor (also referred to as the steering wheel angle sensor) reported unreliable data to the ESC control module prior to the Crash. (ECF No. 187 at 4, ¶ 15; ECF No. 218 at 4, ¶ 15.)[5] The ESC control

---

[5] The detailed record related to each of the 11 documented diagnostic faults recorded in the subject vehicle is addressed elsewhere in the record, including in Mr. Loudon's expert report (ECF No. 218-2 at 22–34) and in the Court's contemporaneous Order addressing Defendants' *Daubert* Motions pertaining to Mr. Loudon. (ECF No. 332 at 5–6.) These facts are not disputed in any way material to the Court's analysis here. As relevant here, Plaintiffs' briefing summarizes that "Mr. Loudon agrees that Fault No. 1"— which pertains to the steering wheel angle sensor—"is the only one that is pertinent to" the alleged system defect that disabled the ESC system during the Crash. (*See* ECF No. 232 at 8.)

module then disabled the system, so that it was not engaged at the time of the Crash. (ECF No. 187 at 4, ¶ 16; ECF No. 218 at 4, ¶ 16.) In assessing "why the system detected" the faults related to the steering wheel angle sensor, Mr. Loudon testified that "a failure in the sensors is the likely cause." (ECF No. 187-4 at 12.) Regarding the resulting operation of disabling the ESC system, Mr. Loudon testified as follows:

> Q. * * * If you have a fault that is detected, whether it be a sensor or a communication, either one, the appropriate response is to disable ESC; correct?
> A. Yes. If a sensor—if it is based on a sensor that is a fundamental part of the ESC system, yes.
> Q. Because if it doesn't know what's going on it can't make correct adjustments?
> A. Correct.
> Q. Now, why do you think that the vehicle had intermittent faults?
> A. Because the—it either had a sensor problem or if the diagnostic strategy was not well conceived.

(ECF No. 187-4 at 16.) However, as to the final statement quoted above, the Court has, by separate contemporaneous order, found that any testimony from Mr. Loudon regarding a problem with the ESC system's "diagnostic strategy" does not correspond to a disclosed opinion identifying any such actual diagnostic problem, and is inadmissible under Federal Rule of Evidence 702. (*See* ECF No. 332 at 8–11.)

### III. ANALYSIS

**A.     Product Defect: Strict Liability & Negligence Claims**

Colorado has long recognized the doctrine of strict liability in product liability actions against manufacturers of defective products, following the Restatement (Second) of Torts § 402A. *Union Supply Co. v. Pust*, 583 P.2d 276, 280 (1978) (citing *Hiigel v. Gen. Motors Corp.*, 544 P.2d 983 (1975)). Generally speaking, "[t]he Colorado

Products Liability Act, Colo. Rev. Stat. §§ 13-21-401 *et seq.*, defines 'manufacturer,' limits liability of sellers and distributors who are not manufacturers, and creates a presumption of non-defectiveness for products sold ten years or more before any claimed injuries. Under Colorado law, the *sine qua non* of a strict liability claim is the 'sale' of a 'product.'" *Hidalgo v. Fagen, Inc.*, 206 F.3d 1013, 1017–18 (10th Cir. 2000).[6] To establish liability, "[a] plaintiff has the burden of persuasion as to the defective condition of a product. Regardless of whether a product liability action is grounded in negligence or strict liability, a plaintiff must prove that the product was defective." *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 205 (Colo. 1992); *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1300 (10th Cir. 2010).[7]

Plaintiffs may pursue such a claim here against Kelsey-Hayes as the

---

[6] In this Order the Court analyzes the question of whether any product "manufactured" by Kelsey-Hayes was defective applying the statutory definition of "manufacturer" set out in Colorado Revised Statutes § 13-21-401(1).

[7] As a generalization, Colorado law defines the standard of a product being "defective" as requiring a plaintiff to prove that "[a] product is unreasonably dangerous because of a defect in its design if it creates a risk of harm to persons or property that is not outweighed by the benefits to be achieved from such a design." *See* Colorado Jury Instructions, 4th–Civil § 14:3 (June 2017 update). This standard is referred to as imposing a "risk-benefit test." *See Walker v. Ford Motor Co.*, ___ P.3d ___,¶¶ 10, 12, 2015 WL 5260382 (Colo. App. Sept. 10, 2015), *cert. granted*, 2016 WL 3207956 (Colo. June 6, 2016); *see also Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410 (Colo.1986). Other authority supports a finding of defect based on a "consumer expectations test." *See Walker*, 2015 WL 5260382, at *2, ¶ 11; *Biosera, Inc. v. Forma Scientific, Inc.*, 941 P.2d. 284, 286–87 (Colo. App. 1996). The Court is aware that the Colorado Supreme Court presently has under advisement the question of whether "the 'risk-benefit test for strict product liability incorporates the 'consumer expectation' test, such that" a court commits reversible error by separately instructing on the two tests in the alternative. *See Walker*, 2016 WL 3207956 (granting cert.). For present purposes, the Court proceeds assuming that a plaintiff might prevail by showing a defect under either test, or a combination of the two. *See Walker*, 2015 WL 5260382, at *3, ¶ 14 (court of appeals concluding the consumer expectation test is encompassed within the risk-benefit test); *Houston*, 817 F.2d at 85 (summary judgment standard favors the right to trial). However, neither party couches their arguments in terms of these tests, and the question pending before the Colorado Supreme Court does not alter the Court's analysis here, although it may become relevant at trial.

manufacturer of a component used in the vehicle, specifically, the control module or other components of the ESC system that were manufactured by Kelsey-Hayes. *See Union Supply*, 583 P.2d at 281. Colorado law "follow[s] the majority view that a manufacturer of component parts may be held strictly liable for injuries to a consumer caused by design defects in the component parts when they are expected to and do reach the consumer without substantial change in condition." *Id.*

Arguing for summary judgment, Kelsey-Hayes cites to Mr. Loudon's testimony, set out above, explaining that the reason the ESC system was disabled at the time of the Crash—and therefore was allegedly defective— was because the steering wheel angle sensor was reporting unreliable data to the control module, that the control module therefore disabled the ESC system, and that this was the appropriate response to unreliable sensor data. (*See* ECF No. 187 at 3–6; ECF No. 187-4 at 12, 16.) In other words, Kelsey-Hayes's argument implies that while Plaintiffs might have a viable component defect as to the data sensors, Kelsey-Hayes did not manufacture those sensors. Kelsey-Hayes argues "[t]here is no evidence of any product defect in any components designed, manufactured, or supplied by Kelsey-Hayes," including the ESC control module. (ECF No. 187 at 6.)

Plaintiffs argue that the vehicle's "ESC system was defective," and that "Kelsey-Hayes is the designer of the 2011 Chevy Silverado's ESC controller that determines when the system will engage." (ECF No. 218 at 8.) Initially, there is some disconnect between, on the one hand, Plaintiffs' arguments directed to a defect in the "ESC system" as a whole (*see*, *e.g.*, *id.* ("the ESC system as designed and manufactured is defective and unreasonably dangerous") and, on the other hand, Kelsey-Hayes's

9

argument distinguishing between the data sensors and the system component(s) that were manufactured by Kelsey-Hayes. Kelsey-Hayes argues "Plaintiffs . . . must demonstrate the specific component Kelsey-Hayes supplied was defective." (ECF No. 187 at 5 (citing *Hidalgo,* 206 F.3d at 1017, and *Bond v. E.I. Du Pont De Nemours & Co.*, 868 P.2d 1114, 1119 (Colo. App.1993)).) In *Bond*, the court observed that

> Defects alleged in design, including a failure to warn, are not easily attributed to one component part, group of parts, or the final product. The difficulty is due in part to the fact that the determination of the existence of such a "defect" turns on a risk-benefit or equivalent analysis of what constitutes an unreasonable danger.
>
> *Nevertheless, a plaintiff must present evidence from which a jury could find that any "defect" was in the "design" of the component part, not the final product.* Thus, the focus of analysis is on whether the component parts or raw materials were unreasonably dangerous as a result of a failure to warn or other design defect at the time of delivery to the manufacturer of the final product.

868 P.2d at 1118–19 (citations omitted; emphasis added). This provides the proper guidance to analyze Kelsey-Hayes's motion, and supports granting summary judgment.

The factual record, as explained above, and conceded by Plaintiffs' own expert, even when viewed in the light most favorable to Plaintiffs, shows that the specific problem or defect in the "ESC system" was, in fact, a "sensor problem" or a "failure in the sensors." (ECF No. 187-4 at 12, 16.) Plaintiffs have not cited any evidence identifying an alleged defect in the control module or in any other component manufactured by Kelsey-Hayes. Although the control module responded to the unreliable sensor data by setting a fault and disabling the ESC system, Mr. Loudon agrees that this was the "appropriate" response for the system when critical input data

had become unreliable. (*Id.* at 16; *see also id.* at 13.)  Thus, any claim of a component defect, including any claim that the ESC system should have been designed with more reliable sensors (*see* ECF No. 218-2 at 36), is a claim that could only lie against the manufacturer of the sensors, not the manufacturer of the control module, which, according to Mr. Loudon, acted appropriately in response to an apparent sensor failure. Since it is undisputed that Kelsey-Hayes was not the manufacturer of the sensors, it is entitled to summary judgment.

Plaintiffs' arguments against summary judgment are unavailing.  Plaintiffs rely primarily on Mr. Loudon's opinions that the ESC system—viewed as a whole—was defective because it was recording "excessive faults."  (See ECF No. 218 at 8; ECF No. 218-1.)  However, as analyzed in the Court's contemporaneously-entered *Daubert* Order regarding Mr. Loudon's testimony, these conclusory opinions are inadmissible under Federal Rule of Evidence 702.[8]  (ECF No. 332 at 11–16.)  Accordingly, Mr. Loudon's generally-stated and inadmissible opinion that "ESC system" as a whole was defective cannot establish a genuine dispute as to an alleged defect in a  component part manufactured by Kelsey-Hayes.[9]

---

[8] The Court's Order regarding Mr. Loudon's testimony does not exclude his testimony as a whole.  Neither that Order nor the analysis here forecloses the possibility that a jury may find a defect in the "final product," that is, in the vehicle, but that does not relieve Plaintiffs of the burden of showing a defect in a specific "component part" to establish liability against Kelsey-Hayes.  *See Bond*, 868 P.2d at 1118–19.

[9] Kelsey-Hayes argues the Court should disregard Mr. Loudon's testimony altogether, as based on only "an inadmissible unsworn expert report."  (See ECF No. 249 at 5, 11; ECF No. 218-2.)  This argument mis-states current federal law.  In opposing summary judgment, a party "may object that the material cited . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, "[a]t the summary judgment phase, evidence need not be submitted in a form that would be admissible at trial," only "the content or substance of the evidence must be admissible."  *Argo v. Blue Cross & Blue Shield of Kansas,*

Moreover, as reviewed both in the Court's separate order and above, Mr. Loudon's testimony tends to show that any defect was in the data sensors, and specifically in the steering wheel angle sensor, not in the control module or in any other component manufactured by Kelsey-Hayes. (ECF No. 187-4 at 16.) The Court agrees with Kelsey-Hayes that the available evidence, including Mr. Loudon's testimony, reflects no genuine dispute as to any alleged defect in the control module or another component that evidence could show was manufactured by Kelsey-Hayes.

Beyond reliance on Mr. Loudon's opinions, Plaintiffs make several arguments to the effect that Kelsey-Hayes should remain liable because it "was aware the system was failing," participated in GM's testing of the ESC system, and had both general and specific knowledge of fault problems that were causing the ESC system installed in this series of vehicles to be disabled. (*See* ECF No. 218 at 9–11.) Initially, these arguments still fail to distinguish between a defect in the "ESC system" and a defect in a component part of that system manufactured by Kelsey-Hayes, and thus fail to show how Kelsey-Hayes is liable. *See Union Supply*, 583 P.2d at 281; *Bond*, 868 P.2d at 1118–19.

Perhaps more importantly, other than citations to Mr. Loudon, Plaintiffs' factual

---

*Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). It is only necessary for the party submitting the evidence to show "that it will be possible to put the information, the substance or content of the evidence, into an admissible form." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (citation and internal quotation marks omitted). To the extent the cases cited by Kelsey-Hayes hold otherwise, they are based on superseded versions of Rule 56. *See* Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendment, Subdivision (c) ("The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record. A formal affidavit is no longer required."). Accordingly, there is no procedural bar to the Court's consideration of those portions of Mr. Loudon's anticipated trial testimony which the Court has not found inadmissible.

arguments are not supported by the evidence they cite. This includes, in particular, the allegation that Kelsey-Hayes was aware of a supposed sensor problem or other defect. In this regard, the Court's review of the evidence submitted by Plaintiffs in opposition to the instant motion shows that it falls far short of their burden in opposing summary judgment. *See Christy*, 810 F. 3d at 1233; *Cross*, 390 F.3d at 1290.

First, Plaintiffs allege that Kelsey-Hayes "knew something in the GMT900 Series vehicles was causing its ESC system to generate fault codes and deactivate." (ECF No. 218 at 9.) Plaintiffs claim this point is supported by the allegation that Kelsey-Hayes "was responsible for conducting Failure Mode Effect Analysis (FMEA) which identifies failure modes of the product, causes, preventative action, and detection action. (*Id.* (citing ECF No. 219-2).)[10] As evidence, Plaintiffs cite to a 72-page long document, without directing the Court to any page or section. This is in contravention of the requirements of D.C.COLO.LCivR 7.1(e). More importantly, the Court finds the import (if any) of the cited document to be totally obscure without some additional explanation or connection to other evidence, which Plaintiffs nowhere provide. (*See* ECF No. 219-2.) So far as the Court can discern, the document nowhere states or establishes that Kelsey-Hayes "was responsible" for the analysis which Plaintiffs allege, or that Kelsey-Hayes "knew something" was causing defective fault codes. Indeed, on face, the document bears the logo of TRW, not of Kelsey-Hayes, Plaintiffs have thus failed even to establish by competent evidence that this document

---

[10] Certain documents supporting the parties' briefing have been filed under Restriction Level 1. To the extent the Court quotes or summarizes these documents, it has concluded that these references do not meet the standard for restriction pursuant to D.C.COLO.LCivR 7.2.

represents any action taken by Kelsey-Hayes, or any facts known to it.[11]  Perhaps

somewhere in the evidence Plaintiffs must have accumulated the during lengthy period

of discovery in this case there is testimony or evidence which makes clear why this

document shows what Plaintiffs claim that it shows.  But Plaintiffs have not provided the

Court with any such illumination, and the Court will not "comb the record" on Plaintiffs'

behalf.  *Ford*, 222 F.3d at 777.

Next, Plaintiffs cite to another lengthy, largely unexplained document which is

titled as a "data Review for ESC/TBS/AC" and appears to be a slide presentation

prepared by a Kelsey-Hayes engineer, Mr. Jeffrey Breitner, in July 2009, although

Plaintiffs fail to provide any relevant explanation.  (*See* ECF No. 218 at 9–10; ECF No.

219-3).)  Plaintiffs cite to the first 3 pages, which state, in part, that "[t]his data

review . . . is necessary to ensure the development process is being conducted

correctly," and reflects review of certain ESC system testing as "agenda" items.  (ECF

No. 219-3 at 2–3.)  Elsewhere, Plaintiffs claim this document supports their

argumentative allegation that Kelsey-Hayes "was intricately [*sic*] involved in the

analysis of the sensor problem . . . yet failed to act to prevent its system from

disabling," and also "knew the ESC was being routinely disabled."  (ECF No. 218 at 5,

¶¶ 11–12.)  Again Plaintiffs' evidence does not support their factual claims.  Viewed in

the light most favorable to Plaintiffs, the document tends to show that Kelsey-Hayes

had access to testing data related to the performance of the ESC system developed for

---

[11] Plaintiffs' briefing asserts—with no explanation or evidence—that "Kelsey-Hayes is a TRW entity."  (ECF No. 218 at 9 n.5.)  Even accepting that this is correct, however, and assuming that the document did in fact originate with Kelsey-Hayes, its contents simply fail to support Plaintiffs' factual claims.

this series of vehicles, and may also have participated in that testing, but this document nowhere identifies a "sensor problem" analyzed by Kelsey-Hayes; nor does it show that Kelsey-Hayes "knew the ESC system was being routinely disabled," which are the material contentions Plaintiffs seek to support.  If the many pages of unexplained technical charts and diagrams to which Plaintiffs cite in bulk somehow support their claims, Plaintiffs have failed to meaningfully articulate how that is the case.  (*See generally* ECF No. 219-3.)  Again, Plaintiffs have failed to "ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record."  *Cross* 390 F.3d at 1290.

Next, Plaintiffs cite in passing to abbreviated and out-of-context deposition testimony from a Mr. Charles Bezzina (who Plaintiffs do not even bother to identify for the Court, but who is evidently a GM engineer knowledgeable about the vehicle's ESC system):

> Q.    Did the Kelsey-Hayes . . . the people who supplied
>        the ESC for the Silverado.  Did they participate in any
>        of the testing that was done by General Motors, to
>        your knowledge?
>
> A.    Oh, yes. We worked together with them on it.

(*See* ECF No. 218 at 5, ¶ 11; *see also* ECF No. 237-4 at 3.)   Again, even viewed in the light most favorable to Plaintiffs, this testimony does not support Plaintiffs' claim that Kelsey-Hayes was "intricately" involved in "analysis of the sensor problem," since no such sensor problem is mentioned.  The same is true of testimony cited by Plaintiffs from Mr. Breitner.  (*See* ECF No. 218 at 10; ECF No. 218-6 at 2–6.)  This evidence could lead a jury to find that Kelsey-Hayes worked with GM in certain testing regarding

the performance or effectiveness of the ESC system.  (ECF No. 218-6 at 2–6.)  But that finding is merely consistent with Mr. Loudon's agreement that "when the system was working, it worked flawlessly."  (ECF No. 218-7 at 2.)  This evidence nowhere shows—as Plaintiffs' claim—that Kelsey-Hayes was responsible for testing the input sensors (which it did not manufacture), was aware of or analyzed a "sensor problem," or "knew the ESC system was being routinely disabled."  (*See* ECF No. 218 at 5, ¶¶ 11–12.)  Plaintiffs' over-reaching and unsubstantiated claims regarding the evidence they cite serve only to undermine the credibility of their arguments overall.

Plaintiffs next cite additional testimony from Mr. Breitner, which Plaintiffs argue shows that Kelsey-Hayes "had full knowledge of the problem that caused the subject accident."  (ECF No. 218 at 10.)  In the cited testimony, Mr. Breitner reviews a document (which Plaintiffs have not provided) referring to Kelsey-Hayes's efforts at some point to address an "[e]xcessive YSC init fault" in the ESC system installed in the relevant vehicle class.  (ECF No. 218-6 at 7.)  This is also referred to as an "Excessive YSC Initialization Time" fault, and, as explained by Mr. Breitner's testimony, was a reported fault related to certain inputs to the ESC control module system taking too long to initialize.  (*See generally* ECF No. 218-6 at 7–12.)  However, even assuming this isolated testimony might support a reasonable jury in finding a defect in a component part manufactured by Kelsey-Hayes, there is no evidence that this alleged defect, that is, the YSC initialization fault, was among the 11 faults recorded in the vehicle in this case, which are documented and explained in detail in the record.  (*See, e.g.*, ECF No. 218-2 at 22–34; ECF No. 249 at 6 n.2; ECF No. 218 at 5, ¶ 4; ECF No. 203 at 5–6 & notes 22–33.)  In particular, this fault is not among the 3 faults that Mr.

Loudon opines were active during the Crash and led to the ESC system being disabled. Thus, even assuming this evidence could tend to show a defect in a component manufactured Kelsey-Hayes, it is not a defect that was a cause of Plaintiff's injuries in this case, and therefore Kelsey-Hayes cannot be liable on this basis.

Lastly, Plaintiffs allege that "[r]egardless of who supplied the [steering wheel angle] sensor, [Kelsey-Hayes] undertook responsibility for and integration of [*sic*] the sensor," (ECF No. 218 at 4, ¶ 17; *id.* at 11–12.) They cite the following testimony of GM engineer and Fed. R. Civ. P. 30(b)(6) designee, Mario Kennedy:

> Q. Who was responsible for system design?
> A. Responsible for system design, General Motors, I believe, is indicated on there, and I believe there's other things on the RASIC chart too. I'm trying to remember if we shared responsibility for that. Are you talking ESC system or integration into the vehicle? What do you mean, system?
> Q. Both the ESC and how it's integrated into the vehicle.
> A. I believe—I would need—I'm going by memory. It would help to have the RASIC chart . . . but I believe TRW[12] is responsible for the system design of the ESC system.
> Q. And the integration was GM's baby?
> A. Integration was both, both GM and T[RW]—shared responsibility.
> Q. What about component design?
> A. Depends on the components.
> Q. Sensors?
> A. Sensors, I believe TRW was responsible for that. That's all a turnkey system. You know, their inertial sensor was something that they used, you know. Now, the steering angle sensor, that may have come from another supplier. I'd have to look at the

---

[12] Although Plaintiffs have not presented any evidence to establish the corporate relationship between TRW and Kelsey-Hayes, viewing the evidence in the light most favorable to Plaintiffs the Court assumes that Mr. Kennedy's references to "TRW" here are in fact directed at Kelsey-Hayes.

> purchasing paperwork on that, but they would—TRW
> would define the interface because that is directly
> wired into their module, I believe.

(ECF No. 218-10 at 2–3.)  As explained above, *supra* note 4, the Court finds no genuine dispute that Kelsey-Hayes was not the manufacturer of the sensors, and in particular the steering angle sensor.  Plaintiffs do not claim otherwise, nor do they argue that Mr. Kennedy's testimony demonstrates that a trial is required to establish that Kelsey-Hayes did not supply the sensors.  (*See* ECF No. 218 at 11.)  Rather, Plaintiffs argue that Mr. Kennedy's testimony shows that Kelsey-Hayes "Integrated the Sensors" and "undertook responsibility for them, including integration," and that Kelsey-Hayes should be liable on that basis.  (*Id.*)

Initially, given Mr. Kennedy's repeated disclaimers that he was uncertain of his answers without reviewing documents (which Plaintiffs have not put before the Court), the Court harbors doubts that there is a *genuine* dispute regarding Kelsey-Hayes's alleged "responsibility" for the sensors.  Kelsey-Hayes's representative, Mr. Littlejohn, testified that Mr. Kennedy "probably didn't have the right information . . . in regards to who is responsible for the external sensors," a position that is not inconsistent with Mr. Kennedy's own stated uncertainty.  (ECF No. 249-2 at 9.)  And, in contrast to Mr. Kennedy's uncertain answers, Mr. Littlejohn testified that "[i]t's very clear" that the sensors were GM's responsibility, and that Kelsey-Hayes "just own[s] the physical connector that's on our [control unit]."  (*Id.* at 9, 26.)   It is far from clear that if this issue proceeded to trial a reasonable jury could find from the evidence that Kelsey-Hayes "undertook responsibility" for the sensors, as Plaintiffs' contend.

18

Nevertheless, viewing the evidence in the light most favorable to Plaintiffs and leaving credibility determinations for the jury, the Court's analysis will assume that a reasonable jury could find from Mr. Kennedy's testimony that Kelsey-Hayes had at least some design responsibility for "ESC system" design and to "define the interface" by which the sensors communicated with Kelsey-Hayes's control module.

Plaintiffs, however, provide no useful explanation of what "integration" and "defin[ing] the interface" actually mean in this context. Their argument continues to suffer from addressing the "ESC system" as a whole, rather than identified components, and they continue to rely on the rhetorical contention, unsupported by the evidence, that "[w]hat matters is that [Kelsey-Hayes] . . . knew [the sensors] were disabling the ESC system." (ECF No. 28 at 11.) Nor do Plaintiffs make any argument based on the relevant legal standards of how this testimony supports their claims that Kelsey-Hayes could be liable as a component manufacturer, including for any defect in the sensors. *See* Colo. Rev. Stat. § 13-21-401(1) (defendant may be liable as a "manufacturer" if shown to have "furnishe[d] . . . specifications *relevant to the alleged defect*" or "otherwise excercise[d] some *significant* control over all or a portion of the manufacturing process" (emphasis added)); *Union Supply*, 583 P.2d at 281 (to prove liability against component manufacturer, Plaintiff must show defect in component parts which "are expected to and do reach the consumer without substantial change in condition"); *Bond*, 868 P.2d at 1118–19 (a plaintiff must present evidence showing a defect in the component part, not only in the final product).

The Court, finds that even viewing Mr. Kennedy's testimony in the light most

favorable to Plaintiffs, any showing of responsibility for "integration" of the sensors or design of the "ESC system" does not defeat Kelsey-Hayes's motion, because the only alleged defect which a reasonable jury could find, based on the evidence presented, is that the steering angle sensor was faulty or was, at a minimum, communicating unreliable data to the control module. This reflects a likely "sensor problem" or "failure in the sensors," just as Mr. Loudon testified. (ECF No. 187-4 at 12, 16.) But no evidence tends to show that Kelsey-Hayes was responsible for the design, specification, reliability, or production of the identified sensor(s). And nothing—other than Mr. Loudon's conclusory and inadmissible opinions and Plaintiffs' rhetorical arguments—tends to show a defect in any "integration," or "interface" for which Kelsey-Hayes may have had responsibility. For example, Plaintiffs cite no evidence to show how a non-defective system would have accounted for a faulty or unreliable sensor, nor do they show that the "interface" either could or should have been designed in a way that preserved operation of the ESC system despite unreliable data, nor have they proffered any other evidence tending to show that the *specific* components which Kelsey-Hayes manufactured were *themselves* defective*.*

In sum, Plaintiffs have failed to carry their burden in opposing summary judgment of setting forth specific facts that establish a genuine issue for trial. *See Christy*, 810 F.3d at 1233. In particular, Plaintiffs have not identified evidence from which a reasonable jury could find they have met their burden of showing there was a defect in a component part manufactured by Kelsey-Hayes, as opposed to a defect in the final product. *See Bond*, 868 P.2d at 1118–19. Proof of such a defect is a

prerequisite to Plaintiffs' product liability claims against Kelsey-Hayes under both strict liability and negligence theories. *Mile Hi Concrete*, 842 P.2d at 205. Accordingly, summary judgment is warranted against both claims.[13]

## B.    Breach of Warranty Claim

For essentially the same reasons analyzed above, Plaintiffs' claims for breach of express and/or implied warranties must also fail. Plaintiffs have not established that the components manufactured by Kelsey-Hayes were in some way unfit, as opposed to a showing of a lack of fitness in the components manufactured by another entity or in the final product (that is, the assembled vehicle). *See Union Supply* ("As in the strict liability area, implied warranty liability can extend to the manufacturer of component parts. Nonetheless, we emphasize that the lack of fitness must be found in the component parts . . . and not merely in the completed system.") Accordingly, summary judgment is also warranted against Plaintiffs on their breach of warranty claim.

## C.    Colorado Consumer Protection Act Claim

To prevail on a claim under the Colorado Consumer Protection Act, Plaintiffs must establish, among other elements, that Kelsey-Hayes committed a deceptive trade practice and that the challenged practice caused Plaintiffs' injuries. *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003). To

---

[13] The Court does not reach the question of what effect, if any, the rebuttable presumption of non-defectiveness established by Colorado Revised Statutes § 13-21-403(1)(b) has at the summary judgment phase, since the Court more simply finds that Plaintiffs have not discharged their burden in opposing summary judgment, with or without such a presumption. (*See* ECF No. 187 at 6.) *See also Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1061 (D. Colo. 2011) (granting summary judgment, holding that "[t]he deficiencies in Plaintiff's proof are exacerbated by the rebuttal presumption created by [Colo. Rev. Stat.] § 13-21-403(3)").

prove a deceptive trade practice, "the plaintiff must show that a defendant knowingly makes a false representation." *Id.* (internal quotation marks omitted).

Here, Plaintiffs argue that Kelsey-Hayes is liable because it "failed to disclose vital ESC safety hazard information to either GM or to end users." (ECF No. 218 at 14.) They rely on the same evidence discussed above to allege that Kelsey-Hayes was aware of such a safety hazard. But, as reviewed above, the evidence cited by Plaintiffs simply does not show that Kelsey-Hayes was aware of a safety problem with its product, as Plaintiffs allege, much less that Kelsey-Hayes made some unspecified misrepresentation or false representation about any such information. Accordingly, Plaintiff's Colorado Consumer Protection Act claim fails as a matter of law.

**D.     Loss of Consortium Claim**

Plaintiff Ginger Pertile's loss of consortium claim is derivative, meaning it cannot survive without a viable theory of liability against Kelsey-Hayes for Daniel Pertile's injuries. *See, e.g., Colorado Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156, 1164 (Colo. 2000) ("Derivative claims are unique in that they depend entirely upon the right of the injured person to recover."). Since all of Plaintiffs' other claims against Kelsey-Hayes fail as a matter of law, Plaintiff Ginger Pertile's loss of consortium also necessarily fails.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Defendant Kelsey-Hayes' Motion for Summary Judgment (ECF No. 187) is
       GRANTED;

2.   Final Judgment will be entered in favor of Defendant Kelsey-Hayes Company as to all of Plaintiffs' claims at the conclusion of this action;

3.   Defendant Kelsey-Hayes Company shall have its costs upon compliance with D.C.COLO.LCivR 54.1; and

4.   The Clerk shall TERMINATE Kelsey-Hayes Company as a Defendant and all future filings by the parties will remove Kelsey-Hayes from the caption.

Dated this 15th day of September, 2017.

BY THE COURT:

William J. Martínez
United States District Judge